IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MARY BLOODSWORTH, et al.,  )
                           )
        Plaintiffs,        )
                           )
vs.                        )        CIVIL ACTION NO. 2:05cv622-D
                           )
SMITH & NEPHEW, INC.; et al.,  )
                           )
        Defendants.        )

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM BRIEF IN FURTHER SUPPORT OF THEIR MOTION TO REMAND

In compliance with this Court's Memorandum Opinion and Order of December 19, 2005, Mary and Jerry Bloodsworth offer this supplemental memorandum brief in further support of their motion to remand. For the reasons stated herein, plaintiffs again ask this Court to remand the matter to the Circuit Court of Montgomery County, Alabama.

In the December 19th Order, this Court wrote:

> ... The court is precluded from "weigh[ing] the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." Crowe, 113 F.3d at 1538. "'If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder is proper and remand the case to the state court.'" Id. (citation omitted). At the same time, however, the possibility of liability on the part of the allegedly fraudulently joined defendant "'must be reasonable, not merely theoretical,'" and, "in considering *possible* state law claims, possible must mean 'more than such a possibility that a designated residence can be hit by

a meteor tonight.'" Legg v. Wyeth, 428 F.3d 1317, 1325 n.5 (11th Cir. 2005)(citations omitted).

When evaluating Smith & Nephew's contentions for removal, the court construes the facts and the controlling law in the light most favorable to Plaintiffs. See Cabalceta, 883 F.2d at 1561. The court also must base its decision on Plaintiffs' "pleadings at the time of removal; but the court [also] may consider affidavits and deposition transcripts submitted by the parties." Crowe, 113 F.3d at 1538; see also Legg, 428 F.3d at 1322. In other words, it is well settled that, upon allegations of fraudulent joinder, federal courts may look beyond the pleading to determine if the joinder is a fraudulent device to prevent removal. See Cabalceta, 883 F.2d at 1561; Williams v. Atlantic Coast Lien R.R. Co., 294 F. Supp. 815, 816 (S.D. Ga. 1968).

Memorandum Opinion and Order at 8-9.

This Court correctly observed that, in reviewing the Bloodsworths' motion to remand, this Court's emphasis must be on whether the plaintiffs named Donnie Lanier as a party-defendant merely as a "device to prevent removal." The central issue becomes whether, based on the complaint and evidentiary submissions, there is a reasonable possibility, and not just a merely theoretical possibility, that Donnie Lanier might be held liable under Alabama substantive law. In light of the highly restrictive nature of diversity jurisdiction, the burden imposed on the Bloodsworth to show a reasonable possibility is low. As observed by this Court, "low" does not mean non-existent. At the same time, this Court must favor finding a reasonable possibility.

Language in the December 19th Order indicates that this Court is resistant to concluding that a sales representative, like Donnie Lanier, may be held legally liable under Alabama substantive law absent evidence of his "direct" participation in some wrongful conduct, for example, knowingly conveying or suppression material information regarding the subject product when communicating with a treating physician.

In discussing the common-law based failure-to-warn cause of action, this Court cited the opinion in <u>Catlett v. Wyeth, Inc.</u>, 379 F. Supp. 2d 1374 (M.D. Ga. 2004), wherein it was established that the Wyeth sales representative faithfully passed onto physicians the safety information that Wyeth supplied her. In addressing the fraud-based causes of action, this Court relied on the general view of sales representatives as mere conduits or "channel[s] through which the corporate entity acts" and asked the Bloodsworths to clarify how Donnie Lanier failed to act as a mere conduit and, thereby, deceived Mary Bloodsworth's treating physician.

In a footnote, this Court wrote:

> The court notes that, even if the foregoing attestations had been offered through the affidavit of the surgeon, another problem lies in the fact, as discussed below, that Plaintiffs have not pleaded with the requisite specificity the factual basis of their fraud claims. If the "dangers" of the products, as alleged in the Complaint (Compl. ¶ 7), arise from the alleged fact that the component parts of the hip prosthesis were not immediately available upon request, rather than on a design or manufacturing defect, that factual basis is not apparent on the face of the Complaint.

<u>Memorandum Opinion and Order</u> at 20 n.6. This statement demonstrates this Court's appreciation that Donnie Lanier might possibly be held legally liable if he provided false material information or suppressed material information regarding the "immediate availability" of component parts. This Court gave the Bloodsworths the opportunity to clarify the factual basis for seeking to hold Donnie Lanier legally liable, including providing more particulars as to how Donnie Lanier allegedly acted in a fraudulent manner.

For some years prior to June 2, 2003, Smith & Nephew sold a prosthetic hip, consisting of an acetabular component, a reflection acetabular cup, and the Echelon fermoral component. (Deposition of James Donald Lanier at 8-10) In the case of some patients, the reflection system will be unstable and dislocate itself. Sometime prior to June 2003, Smith & Nephew secured FDA approval for a constraining liner and ring. This constraining liner and ring was created to address "unstable" reflection systems. (Id. at 14-15) Instead of having to perform a major surgery to remove the entire hip replacement and to implant an entire new hip replacement, a minor surgical procedure is performed whereby the constraining liner and ring is placed around the reflection system. (Id. at 15-16) Ideally, the constraining liner and ring will stabilize the reflection system and eliminate the dislocations.

Donnie Lanier testified that "sometime around [, give or take six months ,] the same period of them that [Mary Bloodsworth] had her initial surgery," Smith & Nephew began marketing constraining liners and rings. (Deposition of James Donald Lanier at 7-8 & 11-12) Donnie Lanier admitted that, at the time of Mary Bloodsworth's initial surgery, he knew that constraining liners and rings were available but stated that he did not know "that the one that she [would] need was available because [he] did not know what size she would have." (Id. at 18-19) Yet, he testified: "I knew at the time of her original surgery that the Reflection constraining liner was available. As far as – and I probably knew at that time the sizes that were available." (Id. at 20-21)

Donnie Lanier testified that, "[a]t the time of the original surgery, [he] would not have had any reason to discuss the constraining liner" with Dr. Hodurski, Mary Bloodsworth's treating surgeon. (Deposition of James Donald Lanier at 21) Donnie

Lanier denied any communications with Dr. Hodurski regarding the availability of constraining liners and rings. (Id. at 20-21) Yet, Donnie Lanier conceded that, prior to Mary Bloodsworth's surgery, he gave Dr. Hodurski a xeroxed copy of a Smith & Nephew-generated "marketing" document regarding constraining liners and rings and indicating information regarding availability. (Id. at 27-29)

In June 2003, Smith & Nephew had yet to start production of constraining liners and rings for all sizes of its reflection system. This was especially true as to unique or non-standard sizes such as the petite size, the size implanted in Mary Bloodsworth in June 2003. In January 2004, when Mary Bloodsworth's treating physician wanted to add a constraining liner and ring to her earlier implanted reflection system, Smith & Nephew had yet to them available to the petite size reflection system. (Deposition of James Donald Lanier at 34-35)

Donnie Lanier testified that physicians "use the documentation that [he] provide[s] for them to give them information about the products" and that he "would expect them to use the information that [he] give[s] them." (Deposition of James Donald Lanier at 38) In his words: "If they want to use my system, I make sure that they have the information in hand that describes the system so that they're not in the dark about how the system works." (Id. at 39)

From Donnie Lanier's deposition testimony, there is evidence that, in June 2003, he failed to adequately inform Mary Bloodsworth's treating surgeon that constraining liners and rings for petite size reflection systems would not be available until some time in 2004, as opposed to being immediately available if Mary Bloodsworth turned out to be one of those patients who experienced instability with her reflection system. Donnie

Lanier acknowledged that, "[i]f [he] needed to know if a product is available, then [he] would just simply call marketing and ask them" if this product is available on the market." (Deposition of James Donald Lanier at 13-14)

Mary Bloodsworth's treating surgeon would have been knowledgeable about this potential for instability and, as a result of reading the document supplied by Donnie Lanier, knew that constraining liners and rings offered a solution in many cases where instability occurred.  In securing her informed consent for using the Smith & Nephew products, the treating surgeon would have informed her of the potential for instability.  In deciding to use the Smith & Nephew products, the treating surgeon would have wanted to know accurate information regarding the availability of constraining liners and rings and, especially, if constraining liners and rings for petite size reflection systems would not be available for some months, likely not until February 2004.  In the present matter, in January 2004, the treating surgeon determined that Mary Bloodsworth needed a constraining liner and ring to address an instability problem and to address the pain that she was experiencing.  Yet, such a constraining liner and ring was not yet available.  Because trying a constraining liner and ring is the preferred conservative course of treatment for an unstable reflection system, Mary Bloodsworth was forced to wait until Smith & Nephew produced one for her petite-size reflection system.

In the present matter, prior to June 3, 2003, Donnie Lanier educated Dr. Hodurski as to Smith & Nephew's marketing of a constraining liner and ring as an additional component to use if an "instability" problem developed.  It is reasonable to infer that Donnie Lanier saw the constraining liner and ring as a plus in getting surgeons to select a Smith & Nephew hip replacement system.  Yet, Donnie Lanier made no effort to contact

Smith & Nephew to learn the actual availability of constraining liners and rings for the various sizes of reflection components.    Donnie Lanier provided Dr. Hodurski no information regarding current or immediate availability of these new constraining liners and rings.  Instead, when decided to inform Dr. Hodurski about how to use a constraining liner and ring, Donnie Lanier chose not to inform Dr. Hodurski that it might be some time before constraining liners and rings would be available, especially for very small or very big sizes.  In other words, Donnie Lanier provided some material information but not all material information.  Under these circumstances, an Alabama state circuit judge would not grant a Rule 12(b)(6)-based dismissal and would likely not grant a summary judgment after the completion of all pre-trial discovery.

As to Donnie Lanier, the salient information was the availability of constraining liners and rings for the size reflection system implanted in Mary Bloodsworth in June 2003.  Based on his own activities, Donnie Lanier left Dr. Hodurski with the reasonable belief that an appropriate constraining liner and ring was immediately available or would available in the next few months if an "instability" problem arose.  As to this information, Donnie Lanier did not act solely as a conduit, especially when he chose to share some manufacturer-generated information with Dr. Hodurski that was only intended for his reading.  Donnie Lanier acted in manner that would expose him to legal liability under Alabama substantive law.

Respectfully submitted by:


s/ Tom Dutton

Attorney for Plaintiffs
Mary Bloodsworth and
Jerry Bloodsworth

OF COUNSEL:

PITTMAN, HOOKS, DUTTON, KIRBY & HELLUMS, PC
2100 Park Place North – 1100 Park Place Tower
Birmingham, Alabama 35203
(205) 322-8880 Phone
(205) 328-2711 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on this the 17th day of January, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James C. Barton, Jr., Esquire
James P. Pewitt, Esquire
Alan D. Mathis, Esquire
Lee McWhorter Pope, Esquire
JOHNSTON BARTON PROCTOR & POWELL LLP
2900 AmSouth/Harbert Plaza
1910 Sixth Avenue, North
Birmingham, AL  35203-2618

s/ Tom Dutton
Of Counsel

FREEDOM COURT REPORTING

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    CIVIL ACTION NO. 2:05cv622-d

6

7    MARY BLOODSWORTH and

8    JERRY BLOODSWORTH,

9        PLAINTIFF(S),

10   VS.

11   SMITH & NEPHEW, et al.,

12       DEFENDANT(S).

13

14              DEPOSITION OF

15           JAMES DONALD LANIER

16           January 13, 2006

17

18       S T I P U L A T I O N

19       IT IS STIPULATED AND AGREED, by and

20   between the parties through their

21   respective counsel, that the deposition of

22   JAMES DONALD LANIER may be taken before

23   Kerry K. Thames, Commissioner, at 2900
```

FREEDOM COURT REPORTING

Page 2

1    AmSouth-Harbert Plaza, Birmingham, Alabama,

2    on January 13, 2006, commencing at 9:05

3    A.M.

4         IT IS FURTHER STIPULATED AND AGREED

5    that the signature to and reading of the

6    deposition by the witness is waived, said

7    deposition to have the same force and

8    effect as if full compliance had been had

9    with all laws and rules of court relating

10   to the taking of depositions.

11        IT IS FURTHER STIPULATED AND AGREED

12   that it shall not be necessary for any

13   objections to be made by counsel to any

14   questions except as to form or leading

15   questions, and that counsel for the parties

16   may make objections and assign grounds at

17   the time of the trial, or at the time said

18   deposition is offered in evidence, or prior

19   thereto.

20        IT IS FURTHER STIPULATED AND AGREED

21   that notice of filing of deposition by

22   commissioner is waived.

23

1   when have you dealt with the doctors in

2   that group, about?

3          A.   For how long have I been --

4          Q.   Yeah, yeah.

5          A.   About -- well, close to twenty

6   years.

7          Q.   Regarding the product that

8   we're here about, about when did it come to

9   market?

10          MR. POPE:  I don't know which

11   -- which product?

12          MR. DUTTON:  The prosthetic hip

13   that was implanted in --

14          MR. POPE:  And I'm not trying

15   to be a wiseacre, because there's -- she

16   had the two surgeries with Dr. Hodurski

17   where different devices were implanted,

18   so --

19          MR. DUTTON:  Okay.

20          Q.   (BY MR. DUTTON)  Well, let's

21   get -- you tell me what we call what.

22          A.   Well, if you're referring to

23   the constraining liner, the constraining

FREEDOM COURT REPORTING

Page 8

1    liner is -- I'm not really sure when that

2    came on the market.  It was sometime -- or

3    at least sometime around the same period of

4    time that she had her initial surgery, but

5    I don't know any dates.  I don't remember

6    specifics.

7        Q.   Okay.  Is that the constraining

8    liner and ring?  Is that what you're -- is

9    that part of the same thing?

10       A.   The constraining liner and the

11   ring are all part of one unit.  That's

12   correct.

13       Q.   Okay.  And what do you call

14   what was implanted at the time of the

15   original surgery?

16       A.   The original surgery, where she

17   had her original total hip replacement --

18       Q.   Yes, sir.

19       A.   -- the primary is what we would

20   call it, that would be the Echelon femoral

21   component and the acetabular component is a

22   Reflection acetabular cup.

23       Q.   Okay.

FREEDOM COURT REPORTING

Page 9

```
1              MR. POPE:   What about the head?

2         A.   Well, the head is just --

3    that's -- the femoral head, I mean, the

4    Smith & Nephew femoral heads are

5    interchangeable with all of our systems.

6         Q.   (BY MR. DUTTON)   The primary

7    unit, did you refer to it as the Echelon

8    unit?

9         A.   The femoral component would be

10   an Echelon -- part of the Echelon system.

11        Q.   Okay.  And the other component

12   was part of the same or a different system?

13        A.   It was a different system

14   because in orthopedics they have the

15   femoral components, which is the whole

16   system by itself, and you have the

17   acetabular components, which is a another

18   system which we call Reflection.

19        Q.   So the acetabular component was

20   called Reflection?

21        A.   Reflection.

22        Q.   And the femoral was Echelon?

23        A.   Correct.
```

Page 10

1        Q.    About when did the Reflection

2    system come to market?

3        A.    You know, I really can't tell

4    you.  It's been on the market, oh, ten,

5    fifteen years.  It's been, you know, the

6    initial cups in that system, around ten or

7    fifteen years ago.  It's been a long time.

8        Q.    Okay.  Same question with

9    regard to the Echelon femoral system?

10        A.    Echelon, probably not as long.

11    Probably ten -- let me think -- maybe ten

12    years.  I don't -- once again, I don't'

13    remember exactly.  I'm saying at least ten

14    years.

15        Q.    Okay.  I was asking you for

16    your judgment, and you're giving me your

17    judgment.  I'm --

18        A.    Yeah, that's not -- that's not

19    exact certainly.

20        Q.    Okay.  At the time of the

21    original procedure, July '03 sound right --

22    June '03?

23              MR. POPE:   June.

Page 11

1          MR. DUTTON:  Yeah, June 2nd,

2    '03, I believe.

3          Q.   (BY MR. DUTTON)  Both systems,

4    then, had been on the market, in your

5    judgment, greater than five years?

6          A.   Yes.

7          Q.   The constraining liner and

8    ring supplements which or both -- which of

9    these systems, or does it supplement both

10   of them?

11         A.   When you say supplement, it --

12   it would be used with the acetabular side,

13   okay.

14         Q.   Okay.  And I may have already

15   asked you this, and if I have, I apologize,

16   but about when was the constraining liner

17   and ring system -- when did it go to

18   market?

19         A.   Once again, sometime around the

20   same period of her initial primary surgery,

21   but I don't remember exactly the date.  I

22   don't know.

23         Q.   Okay, but in close proximity to

Page 12

1    the time of -- we were talking about, June

2    '03?

3          A.    Sometime around there, give or

4    take six months or so.  I don't know

5    exactly.

6          Q.    Okay.  Was it available at the

7    time of the original surgery?

8                MR. POPE:  Object to the form

9    of the question.

10         A.    I really don't know.  I mean,

11   it's -- I can't tell you for sure.

12         Q.    (BY MR. DUTTON)  You could have

13   told me for sure had I asked you that

14   question, say, on June 1st, 2003, true?

15               MR. POPE:  Object to the form.

16         A.    I don't know.

17         Q.    (BY MR. DUTTON)  You could

18   have, had you not known it, you could have

19   obtained the answer to that question, true?

20         A.    All right, give me the date

21   again.  Say again --

22         Q.    June 1st, '03.

23         A.    So that's when we did the

1    original surgery?

2                MR. POPE:  Right --

3        Q.   (BY MR. DUTTON)   That's the day

4    before the original surgery was done.

5                MR. POPE:  -- yeah.

6        A.   You're asking me did I know at

7    that time whether the cup was available or

8    not?

9        Q.   (BY MR. DUTTON)   Yeah.

10       A.   Once again, I don't know

11   because I had no reason to know.  It very

12   well could have been, but I don't remember.

13       Q.   How could you -- you could have

14   obtained the answer to that question?

15       A.   I could have --

16       Q.   Right.

17       A.   -- had I needed to.

18       Q.   How would you have gone about

19   obtaining the answer to that question?

20       A.   If I needed to know if a

21   product is available, then I would just

22   simply call marketing and ask them, you

23   know, is this -- is this product in

Page 14

1    question available for market, if I didn't

2    know at that time.

3         Q.    Did you assume -- well, let me

4    back up.  I'm taking away that partial

5    question.  I'm going to start over.

6              What is the utility of what

7    you're calling the constraining liner and

8    ring?

9         A.    When you say the utility, what

10   do you mean by utility?

11        Q.    Use.

12        A.    Indication, is that what you're

13   meaning, what is the indication for that

14   liner?

15        Q.    We can go with that, yeah.

16        A.    The indication for that liner

17   would be --

18        Q.    Yeah, that's fine.

19        A.    -- if the surgeon so chooses,

20   if he has a situation and a -- resulting

21   from a previous surgery that he feels like

22   there's a need for a constraining liner,

23   that nothing -- that's what's in there at

FREEDOM COURT REPORTING

Page 15

1    the present time is unstable and he needs

2    to do something to revise it, if he feels

3    like the situation requires a constraining

4    liner, then that's -- that's what the

5    indication would be.

6              Q.    Does it -- is its purpose to

7    provide stability and to decrease the

8    chance of dislocation of the primary unit?

9              A.    That would be the -- that would

10   be a purpose of it, yes.

11             Q.    Any other purpose?

12             A.    No.

13             Q.    Constraining liners and rings

14   are used, and I'll save you from having to

15   repeat it, when in the physician's judgment

16   they can decrease the likelihood of further

17   dislocations and make the prosthetic joint

18   more stable?

19             A.    Correct.

20             Q.    And that is, to your

21   observation, a less extensive operation,

22   that is, adding a constraining liner and

23   ring to the original prosthesis, than a

Page 16

1    complete redo of the primary procedure?

2              MR. POPE:   Object to the form

3    of the question.   Go ahead.

4              A.   It could be.   It could be a

5    very -- it could be a -- what you just

6    stated, yes.

7              Q.   (BY MR. DUTTON)  Did the

8    constraining liner and ring that we're

9    talking about, did it have a system name

10   such as Reflection or Echelon or whatever

11   it was?

12             A.   It's in the Reflection system,

13   it is.

14             Q.   Okay, thanks.  How would, with

15   reference to the Echelon and Reflection

16   systems which were implanted in Mary on the

17   2nd of June of '03, how was the order --

18   how would the order have been placed and

19   filled, and what was your involvement in

20   that if there was any?

21             A.   For the primary hip?

22             Q.   Yes, sir, that's right.

23             A.   Okay.  The standard procedure

FREEDOM COURT REPORTING

Page 18

1        A.    I stated I did not know at the

2    time.

3        Q.    You know it wasn't now, do you

4    not?

5            MR. POPE:  Object to the form

6    of the question -- yeah, object to the form

7    of the question.

8        Q.    (BY MR. DUTTON)  You may

9    answer.

10           MR. POPE:  You may answer.

11       A.    I know now that it was not

12   available at that particular time?

13       Q.    (BY MR. DUTTON)  Yes, sir.

14       A.    No, I don't know that.

15       Q.    If I asked you that question

16   with respect to a size 52, would you answer

17   that question differently?

18       A.    All right, let me back up.  Let

19   me -- okay.  I do -- I've got to recount

20   (sic) my statement, okay --

21       Q.    Okay, sure.

22       A.    -- I'm going to answer because

23   at the time of her surgery, her initial

FREEDOM COURT REPORTING

Page 19

1    surgery, I -- I think I did know that that

2    system was available, yes.

3            Q.    You knew the system was

4    available --

5            A.    Yes.

6            Q.    -- did you know the size was

7    available?

8            A.    I did not know the size that we

9    needed at that time.

10           Q.    Okay.

11           A.    So I don't know, then, that the

12   one that she needed was available because I

13   did not know what size she would have.

14           Q.    If she had a -- well, would --

15   would the primary unit have been ordered by

16   size?

17           A.    The primary system?

18           Q.    Yes, sir.

19           A.    No.

20           Q.    Okay.  How does that work?

21           A.    Well, because you don't know

22   until you get into surgery what size is

23   going to be required, so I carry every size

FREEDOM COURT REPORTING

Page 20

1  available into surgery.

2         Q.    So you have every size

3  available available to the surgeon at the

4  time of surgery?

5         A.    I do.

6         Q.    And that's a decision generally

7  made, if not universally made, by the

8  surgeon at the time of surgery, in your

9  experience?

10        A.    That's correct, yes.

11        Q.    Okay.

12             MR. POPE:  Which size to

13  individually use?

14             MR. DUTTON:  Yeah.

15             MR. POPE:  Okay, I just wanted

16  to make sure.

17        Q.    (BY MR. DUTTON)  And are you

18  saying that you knew that at the time of

19  the original surgery that all sizes of the

20  Reflection constraining liner and ring were

21  available?

22        A.    I knew at the time of her

23  original surgery that the Reflection

FREEDOM COURT REPORTING

1    constraining liner was available.  As far

2    as -- and I probably knew at that time the

3    sizes that were available.

4            Q.    What if anything would you have

5    communicated to Dr. Hodurski at the time of

6    the original surgery with respect to the

7    availability or not of Reflection

8    constraining liners and rings?

9            A.    Is that the question --

10           Q.    Yes, sir.

11           A.    -- are you through?  All right.

12   At the time of the original surgery, I

13   would not have had any reason to discuss

14   the constraining liner.

15           Q.    So would it be your testimony

16   that you did not discuss anything about

17   constraining liners and rings of the

18   Reflection system with Dr. Hodurski at the

19   time of Mary's original surgery back in

20   June of '03?

21           A.    That's correct.

22           Q.    Did you communicate with him

23   with respect to size availability of

1    him.

2         Q.    Yeah.   Well, if he requested

3    the constraining liner and ring, you would

4    give it to him, in other words, if he

5    ordered one?

6         A.    Yes.

7         Q.    Yeah.   You distributed no

8    document to Dr. Hodurski or anyone in his

9    group as of June 2, '03, with respect to

10   size availability of the Reflection

11   constraining liner and ring, true?

12        A.    That may not be true.

13        Q.    Is it untrue?

14        A.    That would be untrue.  I think

15   I did, prior to her original surgery, had

16   given Dr. Hodurski a form of the technique.

17        Q.    Which is the document you

18   described for me --

19        A.    Uh-huh (Nodding head).

20        Q.    -- the xeroxed document you

21   described for me a few minutes ago?

22        A.    Yes.

23        Q.    Did that document have any

FREEDOM COURT REPORTING

Page 28

1    information with respect to size

2    availability?

3         A.    Yes, I think it did.

4         Q.    Do you still have that document

5    or a copy of that?

6         A.    No, I don't.

7         Q.    Who did you get it from?

8         A.    It would have come from Smith &

9    Nephew.

10        Q.    Who?  From -- who in Smith &

11   Nephew would have distributed it to you?

12        A.    Well, most likely hip

13   marketing --

14        Q.    Okay.

15        A.    -- total hip marketing.

16        Q.    If I wanted to ask your company

17   if they could find me a copy of that

18   document, what would I name that document?

19             MR. POPE:  Object to the form

20   of the question just to the extent that

21   you're referring to his company as Smith &

22   Nephew, but that's just --

23             MR. DUTTON:  Okay.

1              MR. POPE:  Go ahead and answer

2    the question.

3         A.    There again, I would simply

4    call total hip marketing at Smith & Nephew.

5         Q.    (BY MR. DUTTON)  And ask for

6    what?

7         A.    And ask for -- you could ask

8    them for the interim technique for the

9    Reflection constraining liner that was

10   initially released prior to -- or at the

11   time of the release of the product.

12        Q.    Are you an employee of Smith &

13   Nephew?

14        A.    No.

15        Q.    What's your relationship with

16   them, to your understanding?

17        A.    Well, I work under a contract

18   -- under a corporation which is Lanier

19   Orthopedics, which is an independent

20   contractor with Smith & Nephew.

21        Q.    How long has that been true?

22        A.    The company made changes around

23   the --

1    Reflection constraining liner and ring?

2          A.    There was a delay.

3          Q.    And the reason for that delay?

4          A.    The reason for the delay was

5    that that particular size was not available

6    on -- it was in the process of being

7    produced, but the availability at that time

8    was not there.

9          Q.    Had the company run out of

10   them, or had they not --

11         A.    No.

12         Q.    -- come to market with a size

13   52?  And by as far as come to market, they

14   didn't have any available for distribution

15   at that time in January?

16         A.    The inventory on the

17   constraining liners was a limited inventory

18   on initial release, which means for the

19   extremely smaller sizes or the larger

20   sizes, they had not come to market yet.

21         Q.    Okay.  Did the size 52 -- does

22   that ring true that we're dealing with a

23   size 52?

1      A.    I don't remember the exact

2  sizes.

3      Q.    Okay, the -- well, okay.  The

4  size 52, is that, on either end, is that

5  relatively large or relatively small in the

6  context of your last answer?

7      A.    Size 52 is on the small side,

8  but it's not an odd size, but it -- it's

9  just -- if, in fact, that was the size she

10  has in, I don't remember, whatever size she

11  had in was on the small side because we did

12  not have that size available.

13      Q.    Well, you would have -- then

14  you communicated that to Hodurski, would

15  you have not?

16      A.    I communicated that to him when

17  I had to go back and determine what size

18  she had in place.  I did not have that to

19  memory at the time we scheduled the case.

20      Q.    Sure.  Okay.  And when you

21  checked you found that it had not come to

22  market yet, but was it in the process of

23  coming to market?

1  respect to the interim technique that you

2  said you gave Dr. Hodurski.

3       A.    They use the documentation that

4  we provide for them to give them

5  information about the products.

6       Q.    That's what you're there for,

7  isn't it, I mean, true?

8       A.    To give them information,

9  that's right.

10      Q.    And you would expect them to

11  rely on it, would you not?

12           MR. POPE:  Object to the form

13  of the question.

14      Q.    (BY MR. DUTTON)  You may

15  answer.

16      A.    I would expect them to use the

17  information that I give them.

18      Q.    You don't expect them to rely

19  on that information, or are we saying the

20  same thing?

21           MR. POPE:  Object to the form

22  of the question.  I think he said what he

23  expects them to do with it, but go ahead

FREEDOM COURT REPORTING

Page 39

1    and tell him again.

2         A.    When you say I expect them to

3    do that --

4         Q.    (BY MR. DUTTON)  Yeah.

5         A.    -- I provide information for

6    them to use, and whether or not they use

7    it, that's their call.  If they want to use

8    my system, I make sure that they have the

9    information in hand that describes the

10   system so that they're not in the dark

11   about how the system works.

12        Q.    And you --

13        A.    Now, if they don't read it,

14   that's their call.

15        Q.    It would not surprise you if

16   they were to rely on it?

17             MR. BARTON:  Object to the

18   form.

19             MR. POPE:  Object to the form

20   of the question.

21        Q.    (BY MR. DUTTON)  True?

22        A.    It would not surprise me if

23   they relied on the information.

Page 50

1              C E R T I F I C A T E

2

3    STATE OF ALABAMA:

4    JEFFERSON COUNTY:

5

6        I hereby certify that the above and

7    foregoing deposition was taken down by me

8    in stenotype, and the questions and answers

9    thereto were reduced to typewriting under

10   my supervision, and that the foregoing

11   represents a true and correct transcript of

12   the deposition given by said witness upon

13   said hearing.

14       I further certify that I am neither of

15   counsel nor kin to the parties to the

16   action, nor am I in any way interested in

17   the result of said cause.

18

19

20       KERRY K. THAMES - COMMISSIONER

21

22

23