UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MARY BLOODSWORTH and JERRY BLOODSWORTH, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NUMBER: |
| SMITH & NEPHEW, INC., et al., | ) ) ) | 2:05cv622-d |
| Defendants. | ) ) | |

**DEFENDANTS' SUPPLEMENTAL BRIEF
IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND**

**I.   Introduction.**

Plaintiffs commenced this action with the filing of a complaint against Smith & Nephew, Inc. ("Smith & Nephew"), Spar Medical, Inc. ("Spar Medical"), and Donnie Lanier ("Lanier").  Recognizing that the claims against Spar Medical were baseless, this Court held that Spar Medical had been fraudulently joined.  (Mem. Op. & Order, dated Dec. 19, 2005, p. 11.)  The bulk of the claims against Lanier were likewise recognized as baseless and were summarily rejected by this Court.  (Mem. Op. & Order, dated Dec. 19, 2005, pp. 12-18.)  The only claim against Lanier to survive was an undefined fraud claim, found to be deficient under Rule 9(b).  (Mem. Op. & Order, dated Dec. 19, 2005, pp. 22-23.)

The Court granted plaintiffs an opportunity to attempt to flesh out their fraud claim by deposing Lanier.  Even after deposing Lanier, plaintiffs have failed to present any possibility that they can prove a cause of action against Lanier.  Plaintiffs' latest filing demonstrates that their joinder of Lanier, like their joinder of Spar Medical, is a

sham, designed for the sole purpose of wrongfully defeating the jurisdiction of this Court. *See Legg v. Wyeth*, 428 F.3d 1317, 1320 (11th Cir. 2005) ("this joinder can 'only be characterized as a sham, at the unfair expense not only of [manufacturer defendants] but of many individuals and small enterprises that are being unfairly dragged into court simply to prevent the adjudication of lawsuits against [manufacturer defendants], the real target[s], in a federal forum.'") (quoting *Anderson v. Am. Home Prods. Corp.*, 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002)).

In essence, plaintiffs now allege that before Mrs. Bloodsworth's first surgery, Lanier had a duty to inform Dr. Donald Hodurski ("Dr. Hodurski"), Mrs. Bloodsworth's treating physician, of the availability of a Smith & Nephew product that was not implanted in Mrs. Bloodsworth until several months after her first surgery. It is undisputed, however, that neither Lanier nor Dr. Hodurski knew before the first surgery that Mrs. Bloodsworth would ever require that product and that neither Lanier nor Dr. Hodurski possibly could have known before the first surgery what size product would eventually be used.

Plaintiffs base their suppression claim on repeated misunderstandings of the facts surrounding Mrs. Bloodsworth's surgeries and the respective roles of Lanier and Dr. Hodurski in those surgeries. The deposition testimony of Lanier and Dr. Hodurski exposes these misunderstandings and conclusively shows that there is no possibility that the plaintiffs can prove a cause of action against Lanier, and that their Motion to Remand should be denied.

**II.     The Facts.**

Dr. Hodurski performed a total left hip replacement on Mrs. Bloodsworth on June 2, 2003 (the "Initial Surgery").  (Hodurski Dep., pp. 6-7.)[1]  During the Initial Surgery, Dr. Hodurski implanted a prosthetic hip replacement system (the "Replacement System") manufactured by Smith & Nephew, which was ordered through, and delivered by, Lanier. (Hodurski Dep. pp. 9-11.)  The Replacement System consists of two components: a cup that is implanted in the patient's acetabulum ("Acetabular Cup") and the femoral stem (the "Femoral Stem") that is implanted into the patient's femur.  (Hodurski Dep., p. 8.)  A synthetic ball is attached to the head of the Femoral Stem, and its rests within the Acetabular Cup, simulating the ball and socket mechanism of the hip joint.  (Hodurski Dep., pp. 7-9.)

The exact size of the Acetabular Cup needed for a hip replacement surgery cannot be conclusively determined prior to surgery.  (Hodurski Dep., pp. 9-10.)  Indeed, only after opening up the hip joint during the Initial Surgery could Dr. Hodurski determine which Acetabular Cup size would best fit Mrs. Bloodsworth.  (Hodurski Dep., p. 10; Lanier Dep., pp. 19-20.)[2]  Lanier testified that, for this reason, he brought the entire range of sizes of Acetabular Cups to the delivery room for the Initial Surgery:

> Q.     [W]ould the primary unit [Replacement System] have been ordered by size?
>
> . . .
>
> A.     No.
>
> Q.     Okay.  How does that work?

---

[1] A copy of the full transcript of the deposition of Dr. Hodurski has been attached hereto as Exhibit A.
[2] A copy of the full transcript of the deposition of Lanier has been attached hereto as Exhibit B.

3

>   A.   Well, because you don't know until you get into surgery what size is going to be required, so I carry every size available into surgery.
>
>   Q.   So you have every size available available [sic] to the surgeon at the time of surgery?
>
>   A.   I do.
>
>   Q.   And that's a decision generally made, if not universally made, by the surgeon at the time of surgery, in your experience?
>
>   A.   That's correct, yes.

(Lanier Dep., pp. 19-20.)

Dr. Hodurski confirmed this in his own testimony:

>   Q.   Does [Lanier] actually bring the products to the operating room?
>
>   A.   Yes.
>
>   Q.   And does he bring a range of sizes of the different implants?
>
>   A.   Yes.
>
>   Q.   And what is the purpose of having a different range of sizes of implants there available in the operating room?
>
>   A.   You try to do what we call template or get an idea of the size that you're going to use. If, per chance, you would fracture the bone with reaming or you would encounter a cyst that you didn't see which would require grafting and a bigger component, there are a range of problems you can encounter operatively that you'll need smaller or larger components for so that you really need from A to Z those components that are available.

(Hodurski Dep., pp. 11-12.) Dr. Hodurski determined during the Initial Surgery that a 52-millimeter Acetabular Cup would provide the best fit for Mrs. Bloodsworth and implanted it during that Initial Surgery on June 2, 2003.

Subsequently, Mrs. Bloodsworth fell in the shower and thereafter suffered from recurrent hip dislocation problems. This led Dr. Hodurski to decide in early 2004 to undertake a second surgery to revise Mrs. Bloodsworth's prosthesis in hopes of preventing further dislocations. (Hodurski Dep., p. 13.) Implanting a constrained liner (the "Constrained Liner") was one of several options Dr. Hodurski considered for the revision surgery. (Hodurski Dep., pp. 16-18). The Constrained Liner (a liner with a locking ring) fits in the Acetabular Cup of the Replacement System, its purpose being to prevent the ball on the Femoral Head from coming out of the Acetabular Cup and resulting in a dislocation. (Hodurski Dep., pp. 14-15.) The Constrained Liner's size depends on the size of the Acetabular Cup, which, as previously stated, cannot be determined prior to its initial implantation during the Initial Surgery. (Hodurski Dep., pp. 15-16.)

Before Dr. Hodurski performed the Initial Surgery, he did not, and had no reason to, anticipate implanting a Constrained Liner into Mrs. Bloodsworth. (Hodurski Dep., p. 16.) A Constrained Liner would be used only in performing a revision of a hip replacement. Accordingly, there would be no reason to anticipate using a Constrained Liner, or any other revision device, unless and until the patient was having problems:

> Q. And, generally speaking, when we talk about a revision, explain to us what that term means in this context.

> A. It's a -- you're prepared to redo the operation once again to either modify, remove or totally redo the previous surgery *for the problems the patient has*.

(Hodurski Dep., pp. 12-13) (emphasis added). Accordingly, until Mrs. Bloodsworth developed dislocation problems after falling in the shower, Dr. Hodurski had no reason to consider which device he might use if a revision surgery became necessary. This was particularly so since the primary Replacement System had done well in other patients in Dr. Hodurski's experience. (Hodurski Dep., pp. 26-28.)

When the decision was made to go forward with a revision surgery, Dr. Hodurski informed Lanier that he wanted "everything known orthopedically" to be in the operating room for Mrs. Bloodsworth's revision surgery, including the Constrained Liner. (Hodurski Dep., pp. 17-18, 25.) Dr. Hodurski wanted "everything we've got, big heads, offset liners, constrained liners, lateral displaced liners . . . I need all the bells and whistles." (Hodurski Dep., p. 18.) Lanier then checked with Smith & Nephew and learned that the Constrained Liner size that matched the Acetabular Cup size implanted during the Initial Surgery -- 52 millimeters -- would be available in approximately three to four weeks, although other sizes -- as small as 54 millimeters -- were immediately available. (Hodurski Dep., pp. 18-19; Lanier Dep., pp. 35-36.) Dr. Hodurski could have performed the surgery with a 54-millimeter Constrained Liner, but decided to postpone the revision surgery to wait on the 52-millimeter Constrained Liner so that he could avoid "redoing" the Acetabular Cup, if possible. (Hodurski Dep., pp. 18-19, 24-25.)

Lanier processed Dr. Hodurski's order and, as requested, delivered to the operating room every medical device that could be used for the revision surgery. (Hodurski Dep., pp. 12-14, 17-19.) Dr. Hodurski determined during the revision surgery

6

on February 2, 2004, that implanting a matching size Constrained Liner would be the best course of action. (Hodurski Dep., pp. 16-17.)

Dr. Hodurski testified that the postponement of the revision surgery was for Mrs. Bloodsworth's benefit and did not cause her any harm:

> Q. Was Mrs. Bloodsworth's medical condition harmed in any way by your decision to wait until the 52 was available?
>
> A. No.

(Hodurski Dep., p. 20.)

### III. The Undisputed Evidence Shows There is No Possibility Plaintiffs Can Prove a Suppression Claim Against Lanier.

In order for a plaintiff to prevail on a fraudulent suppression claim, it must prove:

> (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that material existing fact; (3) that the defendant had actual knowledge of the fact; (4) that defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result.

*Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1161 (Ala. 2003) (citations omitted). As recognized by this Court, "plaintiffs were not the recipients of the alleged . . . omissions," making Lanier's communications with Dr. Hodurski leading up to the Initial Surgery the focus of inquiry. (Mem. Op. & Order, dated Dec. 19, 2005, p. 25.) Thus, plaintiffs must prove that (1) at the time of the Initial Surgery, the availability of the matching size Constrained Liner was an existing material fact that Lanier had a duty to disclose to Dr. Hodurski; (2) Lanier suppressed the fact that, at some later date, the matching size Constrained Liner would take three to four weeks for delivery; (3) Lanier had actual knowledge of that fact; (4) Lanier's suppression induced

Dr. Hodurski to implant the Replacement System during the Initial Surgery; and (5) Mrs. Bloodsworth suffered actual damages as a proximate result of Lanier's suppression. Plaintiffs cannot prove even one of these elements. The evidence is clear that the availability of the matching size Constrained Liner was not a material fact; Lanier could not have had actual knowledge that delivery of the matching size Constrained Liner would take three to four weeks; and Dr. Hodurski was not induced to implant the Replacement System as a result of Lanier not informing him of the delivery time of the matching size Constrained Liner.

**A.    The delivery time for the matching size Constrained Liner was not an existing *material* fact at the time of the Initial Surgery.**

Plaintiffs make the unsupported, and erroneous, claim that "in deciding to use Smith & Nephew products, [Dr. Hodurski] would have wanted to know accurate information regarding the availability of constrained liners . . . ." (Plaintiffs' Supp. Mem. Brief, p. 6.) Yet, Dr. Hodurski testified as follows:

> Q.    Prior to the initial surgery, did you and Donnie Lanier discuss the availability of different sizes of Smith & Nephew constrained liners?
>
> A.    No.
>
> Q.    Was the availability of the different size constrained liners a factor that you considered when deciding to use Smith & Nephew products in the initial surgery?
>
> A.    No.
>
> Q.    Was the availability of different size constrained liners an issue at all with you before performing the initial surgery?
>
> A.    No.

8

(Hodurski Dep., pp. 20-21.)  This clear testimony from Dr. Hodurski puts the lie to plaintiffs' speculative assertions and demonstrates that the availability of a matching size Constrained Liner *was not material* to Dr. Hodurski's decision to implant the Smith & Nephew Replacement System during the Initial Surgery, a system with which Dr. Hodurski has had good experiences in other patients both before and after Mrs. Bloodsworth's Initial Surgery.  (Hodurski Dep., pp. 26-28.)

> **B.     Lanier did not have, and could not have had, actual knowledge prior to the Initial Surgery that the matching size Constrained Liner would not be immediately available.**

As discussed previously, the Constrained Liner used during the revision surgery was fitted into the Acetabular Cup that had been implanted during the Initial Surgery, thus making the size of the Constrained Liner dependent upon the size of the Acetabular Cup.  (Hodurski Dep., pp. 14-16.)  And as Dr. Hodurski testified, the size of the Acetabular Cup could not have been determined until its implantation during the Initial Surgery:

> Q.     And is it true . . . that you recognize or realize the exact size [of the acetabular cup] . . . upon performing the surgery?
>
> A.     Yes, at surgery.
>
> Q.     And would that be true with respect to Mrs. Bloodsworth's initial surgery as well?
>
> A.     Correct.

(Hodurski Dep., p. 10.)

It is for this reason that Lanier brought the entire range of Acetabular Cup sizes to the operating room for the Initial Surgery.  (Lanier Dep., pp. 19-20.)  Indeed, it was not until Dr. Hodurski began the Initial Surgery and determined which Acetabular Cup size

9

to use that the matching size Constrained Liner could be determined. Lanier, therefore, did not and could not know the matching size of the Constrained Liner prior to the Initial Surgery, much less the delivery schedule for that size Constrained Liner.

Lanier's knowledge is nevertheless irrelevant because, above all else, Dr. Hodurski's undisputed testimony shows that the availability of a matching size Constrained Liner had absolutely no effect on the way Dr. Hodurski performed the Initial Surgery. Indeed, the availability of a matching size Constrained Liner was not "an issue at all" with him.

**C.    Lanier did not induce Dr. Hodurski to implant the Replacement System by failing to discuss the delivery times for the various sizes of Constrained Liners.**

Dr. Hodurski's testimony puts to rest any notion that he was induced to implant the Replacement System during the Initial Surgery by Lanier's alleged suppression of the delivery times for various sizes of Constrained Liners:

> Q.    Prior to the initial surgery, did you and Donnie Lanier discuss the availability of different sizes of Smith & Nephew constrained Liners?
>
> A.    No.
>
> Q.    Was the availability of the different size constrained liners a factor that you considered when deciding to use Smith & Nephew products in the initial surgery?
>
> A.    No.
>
> Q.    Was the availability of different size constrained liners an issue at all with you before performing the initial surgery?
>
> A.    No.
>
> . . .

>Q. If you had known prior to Mrs. Bloodsworth's initial surgery that the constrained liner was not available in certain sizes, would that have affected in any way the way that you performed her initial surgery?
>
>A. No.
>
>Q. And along those same lines . . . If you had known prior to Mrs. Bloodsworth's initial surgery that the constrained liner was not available in certain sizes and maybe even -- or even the size that she would eventually need, would you have still used the [Smith & Nephew Replacement System] in that surgery?
>
>A. Yes.
>
>Q. As you sit here today, is there anything that you think that Donnie Lanier should have told you prior to the initial surgery that he did not?
>
>A. No.
>
>Q. Do you have any complaints about Donnie Lanier with respect to his communications with you about Smith & Nephew products prior to the initial surgery?
>
>A. No.
>
>Q. And you still perform hip replacements as we sit here today?
>
>A. Yes.
>
>Q. And before you perform those surgeries, do you check on the availability of various sizes of constrained liners?
>
>A. No.
>
>Q. Do you know of any orthopedist here in Montgomery who does?
>
>A. No.

(Hodurski Dep., pp. 20-23.)

11

Dr. Hodurski's testimony could not be clearer. The availability of the Constrained Liner was not "an issue at all" with him. He would have chosen the same products for the Initial Surgery even if he had known the matching size Constrained Liner would not be immediately available. The undisputed evidence shows unmistakably that Dr. Hodurski was not induced to implant the Replacement System during the Initial Surgery by anything Lanier said or did not say to him. Accordingly, plaintiffs' suppression claim fails.

## IV.     Plaintiffs' Motion to Remand Should Be Denied.

Plaintiffs' claims against Lanier have been whittled down to one specious claim--a claim not even hinted at in their complaint commencing this action. This claim, like those already dismissed, "presents no possibility that the plaintiff[s] can prove a cause of action against" Lanier. *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). The uncontroverted evidence demonstrates that plaintiffs cannot maintain a suppression claim, or any other claim, against Lanier. Lanier, the alleged suppressor, did not have, and could not have had, actual knowledge of the fact allegedly suppressed. Moreover, Dr. Hodurski did not rely on Lanier's alleged suppression in determining whether to implant the Smith & Nephew products at issue in this action.

Plaintiffs have had ample opportunity to state a viable claim against Lanier, but they have failed. Their attempt to keep Lanier in this case has been exposed for what it is: a ploy to rob this Court of its jurisdiction--the very definition of fraudulent joinder. Lanier should be dismissed as a defendant in this action, and plaintiffs' Motion to Remand accordingly denied.

                                            s/ Lee M. Pope
                                            James C. Barton, Jr.
                                            Lee M. Pope
                                            Alan D. Mathis

                                            Attorneys for Defendants
                                            Smith & Nephew, Inc. and
                                            Donnie Lanier


**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone: (205) 458-9400
Facsimile: (205) 458-9500

    **OF COUNSEL**


**CERTIFICATE OF SERVICE**

    I hereby certify that on this the 10th day of February, 2006, I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    Mr. Tom Dutton
    Pittman, Hooks, Dutton, Kirby
      & Hellums, P.C.
    1100 Park Place Tower
    2001 Park Place North
    Birmingham, Alabama 35203


                                            s/ Lee M. Pope
                                            Of Counsel

W0543221.DOC