## FREEDOM COURT REPORTING

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NO. 2:05cv622-d


MARY BLOODSWORTH and

JERRY BLOODSWORTH,

    PLAINTIFF(S),

VS.

SMITH & NEPHEW, et al.,

    DEFENDANT(S).

COPY


DEPOSITION OF

JAMES DONALD LANIER

January 13, 2006


S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and

between the parties through their

respective counsel, that the deposition of

JAMES DONALD LANIER may be taken before

Kerry K. Thames, Commissioner, at 2900

# FREEDOM COURT REPORTING

1  AmSouth-Harbert Plaza, Birmingham, Alabama,

2  on January 13, 2006, commencing at 9:05

3  A.M.

4      IT IS FURTHER STIPULATED AND AGREED

5  that the signature to and reading of the

6  deposition by the witness is waived, said

7  deposition to have the same force and

8  effect as if full compliance had been had

9  with all laws and rules of court relating

10  to the taking of depositions.

11      IT IS FURTHER STIPULATED AND AGREED

12  that it shall not be necessary for any

13  objections to be made by counsel to any

14  questions except as to form or leading

15  questions, and that counsel for the parties

16  may make objections and assign grounds at

17  the time of the trial, or at the time said

18  deposition is offered in evidence, or prior

19  thereto.

20      IT IS FURTHER STIPULATED AND AGREED

21  that notice of filing of deposition by

22  commissioner is waived.

23

# FREEDOM COURT REPORTING

```
1                          INDEX

2

3    EXAMINATION BY:                    PAGE NO.

4

5    Mr. Dutton                              5

6

7

8

9                        EXHIBITS

10

11   Plaintiff's Exhibit:

12   No. 1                                   46

13

14

15

16

17

18

19

20

21

22

23
```

# FREEDOM COURT REPORTING

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFF(S):

 4   Mr. Tom Dutton

 5   PITTMAN, HOOKS, DUTTON, KIRBY & HELLUMS

 6   1100 Park Place Tower

 7   2001 Park Place North

 8   Birmingham, Alabama 35203

 9

10

11   FOR THE DEFENDANT(S):

12   Mr. James C. Barton, Jr., and

13      Mr. Lee M. Pope

14   JOHNSTON, BARTON, PROCTOR & POWELL

15   2900 AmSouth-Harbert Plaza

16   Birmingham, Alabama 35203

17

18

19

20

21

22

23
```

## FREEDOM COURT REPORTING

1    I, Kerry K. Thames, acting as

2  Commissioner, certify that on this date as

3  provided by the Federal Rules of Civil

4  Procedure, and the foregoing stipulation of

5  counsel, there came before me JAMES DONALD

6  LANIER, witness in the above cause, for

7  oral examination, whereupon the following

8  proceedings were had:

9

10    JAMES DONALD LANIER,

11  being first duly sworn, was examined and

12  testified as follows:

13

14    THE COURT REPORTER:  Usual

15  stipulations?

16    MR. POPE:  That's fine.

17

18  EXAMINATION BY MR. DUTTON:

19    Q.   Your name is what, please, sir?

20    A.   James Donald Lanier,

21  L-a-n-i-e-r.

22    Q.   Your residence address is what,

23  please?

## FREEDOM COURT REPORTING

1          A.    3542 Royal Carriage Drive in

2    Montgomery, Alabama.

3          Q.    How long have you lived in

4    Montgomery, Alabama?

5          A.    Pretty much all my life.

6          Q.    Continuously during the last

7    five years?

8          A.    Yes.

9          Q.    Your business address, is it

10    the same as your office address or not?

11          A.    It's the same as my home

12    address.

13          Q.    You knew what I was trying to

14    ask you.  Thank you.  You know Dr.

15    Hodurski?

16          A.    I do.

17          Q.    Do you still work with his

18    group?

19          MR. POPE:  Object to the form

20    of the question.  You can answer.

21          A.    I still deal with the doctors

22    in that group.  I do.

23          Q.    (BY MR. DUTTON)  Okay.  Since

## FREEDOM COURT REPORTING

1    when have you dealt with the doctors in

2    that group, about?

3          A.    For how long have I been --

4          Q.    Yeah, yeah.

5          A.    About -- well, close to twenty

6    years.

7          Q.    Regarding the product that

8    we're here about, about when did it come to

9    market?

10          MR. POPE:  I don't know which

11    -- which product?

12          MR. DUTTON:  The prosthetic hip

13    that was implanted in --

14          MR. POPE:  And I'm not trying

15    to be a wiseacre, because there's -- she

16    had the two surgeries with Dr. Hodurski

17    where different devices were implanted,

18    so --

19          MR. DUTTON:  Okay.

20          Q.    (BY MR. DUTTON)  Well, let's

21    get -- you tell me what we call what.

22          A.    Well, if you're referring to

23    the constraining liner, the constraining

## FREEDOM COURT REPORTING

1  liner is -- I'm not really sure when that

2  came on the market.  It was sometime -- or

3  at least sometime around the same period of

4  time that she had her initial surgery, but

5  I don't know any dates.  I don't remember

6  specifics.

7      Q.   Okay.  Is that the constraining

8  liner and ring?  Is that what you're -- is

9  that part of the same thing?

10     A.   The constraining liner and the

11 ring are all part of one unit.  That's

12 correct.

13     Q.   Okay.  And what do you call

14 what was implanted at the time of the

15 original surgery?

16     A.   The original surgery, where she

17 had her original total hip replacement --

18     Q.   Yes, sir.

19     A.   -- the primary is what we would

20 call it, that would be the Echelon femoral

21 component and the acetabular component is a

22 Reflection acetabular cup.

23     Q.   Okay.

## FREEDOM COURT REPORTING

1          MR. POPE:  What about the head?

2          A.    Well, the head is just --

3     that's -- the femoral head, I mean, the

4     Smith & Nephew femoral heads are

5     interchangeable with all of our systems.

6          Q.    (BY MR. DUTTON)  The primary

7     unit, did you refer to it as the Echelon

8     unit?

9          A.    The femoral component would be

10    an Echelon -- part of the Echelon system.

11         Q.    Okay.  And the other component

12    was part of the same or a different system?

13         A.    It was a different system

14    because in orthopedics they have the

15    femoral components, which is the whole

16    system by itself, and you have the

17    acetabular components, which is a another

18    system which we call Reflection.

19         Q.    So the acetabular component was

20    called Reflection?

21         A.    Reflection.

22         Q.    And the femoral was Echelon?

23         A.    Correct.

# FREEDOM COURT REPORTING

1    Q.    About when did the Reflection

2    system come to market?

3    A.    You know, I really can't tell

4    you.  It's been on the market, oh, ten,

5    fifteen years.  It's been, you know, the

6    initial cups in that system, around ten or

7    fifteen years ago.  It's been a long time.

8    Q.    Okay.  Same question with

9    regard to the Echelon femoral system?

10    A.    Echelon, probably not as long.

11    Probably ten -- let me think -- maybe ten

12    years.  I don't -- once again, I don't

13    remember exactly.  I'm saying at least ten

14    years.

15    Q.    Okay.  I was asking you for

16    your judgment, and you're giving me your

17    judgment.  I'm --

18    A.    Yeah, that's not -- that's not

19    exact certainly.

20    Q.    Okay.  At the time of the

21    original procedure, July '03 sound right --

22    June '03?

23    MR. POPE:    June.

## FREEDOM COURT REPORTING

1          MR. DUTTON:  Yeah, June 2nd,

2    '03, I believe.

3          Q.   (BY MR. DUTTON)  Both systems,

4    then, had been on the market, in your

5    judgment, greater than five years?

6          A.   Yes.

7          Q.   The constraining liner and

8    ring supplements which or both -- which of

9    these systems, or does it supplement both

10   of them?

11         A.   When you say supplement, it --

12   it would be used with the acetabular side,

13   okay.

14         Q.   Okay.  And I may have already

15   asked you this, and if I have, I apologize,

16   but about when was the constraining liner

17   and ring system -- when did it go to

18   market?

19         A.   Once again, sometime around the

20   same period of her initial primary surgery,

21   but I don't remember exactly the date.  I

22   don't know.

23         Q.   Okay, but in close proximity to

## FREEDOM COURT REPORTING

1    the time of -- we were talking about, June

2    '03?

3         A.    Sometime around there, give or

4    take six months or so.  I don't know

5    exactly.

6         Q.    Okay.  Was it available at the

7    time of the original surgery?

8              MR. POPE:  Object to the form

9    of the question.

10        A.    I really don't know.  I mean,

11   it's -- I can't tell you for sure.

12        Q.    (BY MR. DUTTON)  You could have

13   told me for sure had I asked you that

14   question, say, on June 1st, 2003, true?

15             MR. POPE:  Object to the form.

16        A.    I don't know.

17        Q.    (BY MR. DUTTON)  You could

18   have, had you not known it, you could have

19   obtained the answer to that question, true?

20        A.    All right, give me the date

21   again.  Say again --

22        Q.    June 1st, '03.

23        A.    So that's when we did the

## FREEDOM COURT REPORTING

1    original surgery?

2            MR. POPE:  Right --

3        Q.   (BY MR. DUTTON)  That's the day

4    before the original surgery was done.

5            MR. POPE:  -- yeah.

6        A.   You're asking me did I know at

7    that time whether the cup was available or

8    not?

9        Q.   (BY MR. DUTTON)  Yeah.

10       A.   Once again, I don't know

11   because I had no reason to know.  It very

12   well could have been, but I don't remember.

13       Q.   How could you -- you could have

14   obtained the answer to that question?

15       A.   I could have --

16       Q.   Right.

17       A.   -- had I needed to.

18       Q.   How would you have gone about

19   obtaining the answer to that question?

20       A.   If I needed to know if a

21   product is available, then I would just

22   simply call marketing and ask them, you

23   know, is this -- is this product in

## FREEDOM COURT REPORTING

1  question available for market, if I didn't

2  know at that time.

3        Q.    Did you assume -- well, let me

4  back up.  I'm taking away that partial

5  question.  I'm going to start over.

6            What is the utility of what

7  you're calling the constraining liner and

8  ring?

9        A.    When you say the utility, what

10  do you mean by utility?

11        Q.    Use.

12        A.    Indication, is that what you're

13  meaning, what is the indication for that

14  liner?

15        Q.    We can go with that, yeah.

16        A.    The indication for that liner

17  would be --

18        Q.    Yeah, that's fine.

19        A.    -- if the surgeon so chooses,

20  if he has a situation and a -- resulting

21  from a previous surgery that he feels like

22  there's a need for a constraining liner,

23  that nothing -- that's what's in there at

## FREEDOM COURT REPORTING

1   the present time is unstable and he needs

2   to do something to revise it, if he feels

3   like the situation requires a constraining

4   liner, then that's -- that's what the

5   indication would be.

6       Q.    Does it -- is its purpose to

7   provide stability and to decrease the

8   chance of dislocation of the primary unit?

9       A.    That would be the -- that would

10   be a purpose of it, yes.

11       Q.    Any other purpose?

12       A.    No.

13       Q.    Constraining liners and rings

14   are used, and I'll save you from having to

15   repeat it, when in the physician's judgment

16   they can decrease the likelihood of further

17   dislocations and make the prosthetic joint

18   more stable?

19       A.    Correct.

20       Q.    And that is, to your

21   observation, a less extensive operation,

22   that is, adding a constraining liner and

23   ring to the original prosthesis, than a

## FREEDOM COURT REPORTING

1   complete redo of the primary procedure?

2          MR. POPE:  Object to the form

3   of the question.  Go ahead.

4          A.    It could be.  It could be a

5   very -- it could be a -- what you just

6   stated, yes.

7          Q.    (BY MR. DUTTON)  Did the

8   constraining liner and ring that we're

9   talking about, did it have a system name

10  such as Reflection or Echelon or whatever

11  it was?

12         A.    It's in the Reflection system,

13  it is.

14         Q.    Okay, thanks.  How would, with

15  reference to the Echelon and Reflection

16  systems which were implanted in Mary on the

17  2nd of June of '03, how was the order --

18  how would the order have been placed and

19  filled, and what was your involvement in

20  that if there was any?

21         A.    For the primary hip?

22         Q.    Yes, sir, that's right.

23         A.    Okay.  The standard procedure

# FREEDOM COURT REPORTING

1   for that is the doctor will schedule a

2   surgery.  Either -- I would check his

3   schedule, the surgery schedule book, and

4   determine then when the surgery was

5   scheduled because I know that he's going to

6   use my system.  At that point in time, I

7   would just simply ensure that everything is

8   at the hospital as needed and provide -- of

9   course, the instruments at this particular

10  hospital and the implants stay there, so I

11  just make the sure the inventory and

12  instruments are provided for the surgery.

13          And once the procedure is done,

14  then we would issue a bill only statement

15  to the -- or a bill only statement to the

16  hospital, where they, in turn, are invoiced

17  with a PO number from Smith & Nephew for

18  the purchase of the items.

19          Q.   Prior to the Reflection

20  constraining liner and ring becoming

21  available, and you're not saying it was

22  available at the time of the original

23  surgery, are you?

## FREEDOM COURT REPORTING

1      A.    I stated I did not know at the

2  time.

3      Q.    You know it wasn't now, do you

4  not?

5          MR. POPE:  Object to the form

6  of the question -- yeah, object to the form

7  of the question.

8      Q.    (BY MR. DUTTON)  You may

9  answer.

10         MR. POPE:  You may answer.

11     A.    I know now that it was not

12  available at that particular time?

13     Q.    (BY MR. DUTTON)  Yes, sir.

14     A.    No, I don't know that.

15     Q.    If I asked you that question

16  with respect to a size 52, would you answer

17  that question differently?

18     A.    All right, let me back up.  Let

19  me -- okay.  I do -- I've got to recount

20  (sic) my statement, okay --

21     Q.    Okay, sure.

22     A.    -- I'm going to answer because

23  at the time of her surgery, her initial

## FREEDOM COURT REPORTING

1   surgery, I -- I think I did know that that

2   system was available, yes.

3           Q.    You knew the system was

4   available --

5           A.    Yes.

6           Q.    -- did you know the size was

7   available?

8           A.    I did not know the size that we

9   needed at that time.

10          Q.    Okay.

11          A.    So I don't know, then, that the

12  one that she needed was available because I

13  did not know what size she would have.

14          Q.    If she had a -- well, would --

15  would the primary unit have been ordered by

16  size?

17          A.    The primary system?

18          Q.    Yes, sir.

19          A.    No.

20          Q.    Okay.  How does that work?

21          A.    Well, because you don't know

22  until you get into surgery what size is

23  going to be required, so I carry every size

## FREEDOM COURT REPORTING

1  available into surgery.

2          Q.    So you have every size

3  available available to the surgeon at the

4  time of surgery?

5          A.    I do.

6          Q.    And that's a decision generally

7  made, if not universally made, by the

8  surgeon at the time of surgery, in your

9  experience?

10         A.    That's correct, yes.

11         Q.    Okay.

12         MR. POPE:    Which size to

13  individually use?

14         MR. DUTTON:    Yeah.

15         MR. POPE:    Okay, I just wanted

16  to make sure.

17         Q.    (BY MR. DUTTON)  And are you

18  saying that you knew that at the time of

19  the original surgery that all sizes of the

20  Reflection constraining liner and ring were

21  available?

22         A.    I knew at the time of her

23  original surgery that the Reflection

## FREEDOM COURT REPORTING

1   constraining liner was available.  As far

2   as -- and I probably knew at that time the

3   sizes that were available.

4         Q.    What if anything would you have

5   communicated to Dr. Hodurski at the time of

6   the original surgery with respect to the

7   availability or not of Reflection

8   constraining liners and rings?

9         A.    Is that the question --

10        Q.    Yes, sir.

11        A.    -- are you through?  All right.

12  At the time of the original surgery, I

13  would not have had any reason to discuss

14  the constraining liner.

15        Q.    So would it be your testimony

16  that you did not discuss anything about

17  constraining liners and rings of the

18  Reflection system with Dr. Hodurski at the

19  time of Mary's original surgery back in

20  June of '03?

21        A.    That's correct.

22        Q.    Did you communicate with him

23  with respect to size availability of

## FREEDOM COURT REPORTING

1    Reflection constraining liners and rings in

2    any other manner, that is, other than

3    telling him at that time?

4         A.   No.

5         Q.   So it would be your testimony

6    that back in June of '03, at the time of

7    Mary's original surgery, you communicated

8    nothing to Dr. Hodurski about the

9    availability by size of Reflection

10   constraining liners and rings?

11        A.   Correct.

12        Q.   Did the Reflection constraining

13   liner and ring replace any other

14   constraining liner and ring system which

15   had previously been used with the

16   acetabular system, the Reflection

17   acetabular system?

18        A.   No.

19        Q.   Had you received any premarket

20   training about the Reflection constraining

21   liner and ring?

22        A.   No.

23        Q.   No prelaunch training or

# FREEDOM COURT REPORTING

1    anything of that nature?

2        A.   Not -- not formal training, no.

3        Q.   How would Smith & Nephew have

4    advised you that it was coming to market?

5        A.   They would have sent out

6    correspondence from the company describing

7    the product, along with the use of the

8    product, how it's to be used in surgery,

9    along with sizes, technique of the

10   assembly, and things such as that.

11        Q.   Along with sizes and technique

12   of assembly?

13        A.   Uh-huh (Nodding head).

14        Q.   Okay.  Would that be in the

15   form of both sales training material and in

16   the form of materials to be shared with the

17   operating physicians?

18        MR. POPE:  Object to the form

19   of the question.  You can answer if you

20   understand what he's talking about.

21        A.   The -- there really was -- the

22   only sales plan, like I said, was not

23   really a formal sales training.  It was

## FREEDOM COURT REPORTING

1    simply correspondence that comes for

2    in-office use only, not to be disclosed

3    to a surgeon or to, you know, any other

4    person --

5            Q.    (BY MR. DUTTON)   Right.

6            A.    -- the -- so, other than that,

7    that's all the sales material that comes to

8    me as far as training.   And then what --

9    there was probably, at some time, there was

10   a technique, interim technique, that was

11   issued for the surgeons so that they would

12   have some information that they could look

13   at as to how the product is used and put

14   together in surgery.

15           Q.    Okay.   In your organization, is

16   the sales training material which is not to

17   be shared, and for your eyes only so to

18   speak, is it so stamped?   Is there any kind

19   of stamp --

20           A.    It is.

21           Q.    Okay.   And what is your

22   company's -- how does it read?

23           MR. POPE:   Well, I --

# FREEDOM COURT REPORTING

1    A.    It says -- I don't know

2   exactly, just says do not disclose to -- do

3   not allow surgeons to read this material,

4   basically.  I don't -- the exact wording of

5   it, I don't know, but that's basically what

6   it's saying.

7    Q.    (BY MR. DUTTON)  You've seen it

8   so many times, you know what it means, but

9   you don't know what it says?

10    A.    Yeah, I know it's going to say

11   it at the bottom of the letter, so I . . .

12    Q.    Okay.  And did you also receive

13   stuff, materials, to share with the

14   surgeon?

15    A.    I did have an interim technique

16   of a sort to let him have so he would have

17   some information for his own use.

18    Q.    Okay, and describe this

19   technique document -- was it a document,

20   first of all?

21    A.    It was -- yeah, I guess you

22   would call it a document.

23    Q.    Was it hard copy is what I

# FREEDOM COURT REPORTING

1  mean?

2          A.    It was photocopies, I believe,

3  I'm not sure, I think it was a photocopy of

4  a brochure that would be released in the

5  future, and that's what he had for his

6  personal use.

7          Q.    Okay.  And what was the

8  distribution schedule for that document?

9          A.    What do you mean distribution

10  schedule?

11          Q.    Well, did you go give one to

12  all of your customers --

13          A.    No.

14          Q.    -- as soon as it became

15  available?

16          A.    No.

17          Q.    You gave it to them when they

18  needed --

19          MR. POPE:  If you remember.

20          Q.    (BY MR. DUTTON) -- to use one,

21  when they decided they needed to use --

22          A.    That's -- the only -- yeah, if

23  a doctor requests information, I give it to

## FREEDOM COURT REPORTING

1  him.

2       Q.    Yeah.    Well, if he requested

3  the constraining liner and ring, you would

4  give it to him, in other words, if he

5  ordered one?

6       A.    Yes.

7       Q.    Yeah.    You distributed no

8  document to Dr. Hodurski or anyone in his

9  group as of June 2, '03, with respect to

10  size availability of the Reflection

11  constraining liner and ring, true?

12       A.    That may not be true.

13       Q.    Is it untrue?

14       A.    That would be untrue.    I think

15  I did, prior to her original surgery, had

16  given Dr. Hodurski a form of the technique.

17       Q.    Which is the document you

18  described for me --

19       A.    Uh-huh (Nodding head).

20       Q.    -- the xeroxed document you

21  described for me a few minutes ago?

22       A.    Yes.

23       Q.    Did that document have any

## FREEDOM COURT REPORTING

1  information with respect to size

2  availability?

3         A.    Yes, I think it did.

4         Q.    Do you still have that document

5  or a copy of that?

6         A.    No, I don't.

7         Q.    Who did you get it from?

8         A.    It would have come from Smith &

9  Nephew.

10        Q.    Who?  From -- who in Smith &

11 Nephew would have distributed it to you?

12        A.    Well, most likely hip

13 marketing --

14        Q.    Okay.

15        A.    -- total hip marketing.

16        Q.    If I wanted to ask your company

17 if they could find me a copy of that

18 document, what would I name that document?

19             MR. POPE:  Object to the form

20 of the question just to the extent that

21 you're referring to his company as Smith &

22 Nephew, but that's just --

23             MR. DUTTON:  Okay.

## FREEDOM COURT REPORTING

1          MR. POPE:  Go ahead and answer

2   the question.

3          A.    There again, I would simply

4   call total hip marketing at Smith & Nephew.

5          Q.    (BY MR. DUTTON)  And ask for

6   what?

7          A.    And ask for -- you could ask

8   them for the interim technique for the

9   Reflection constraining liner that was

10  initially released prior to -- or at the

11  time of the release of the product.

12         Q.    Are you an employee of Smith &

13  Nephew?

14         A.    No.

15         Q.    What's your relationship with

16  them, to your understanding?

17         A.    Well, I work under a contract

18  -- under a corporation which is Lanier

19  Orthopedics, which is an independent

20  contractor with Smith & Nephew.

21         Q.    How long has that been true?

22         A.    The company made changes around

23  the --

## FREEDOM COURT REPORTING

1            MR. POPE:  Tell him -- when you

2    say the company, just --

3            A.    Smith & Nephew was -- I think

4    in 2001 they went direct, I think somewhere

5    around 2001 when they actually -- I've been

6    with the company as an independent rep or

7    independent contractor for nearly twenty

8    years, but the company actually went direct

9    with the distributorships that were

10   initially in place.  So the corporation

11   went under Smith & Nephew around 2001 as an

12   independent contractor directly with Smith

13   & Nephew.

14           Q.    (BY MR. DUTTON)  Whereas before

15   the relationship had been with the

16   distributor?

17           A.    That's correct.

18           Q.    With -- was it Spar?

19           A.    Spar Medical, yes.

20           Q.    But you were operating as an

21   independent contractor by the name of

22   Lanier Orthopedics?

23           A.    Uh-huh (Nodding head).

# FREEDOM COURT REPORTING

1        Q.    On June 2nd of '03?

2        A.    Yes.

3        Q.    When you say independent

4    contractor, is there a written agreement

5    between your company -- are you the sole

6    owner of Lanier Orthopedics?

7        A.    Yes.

8        Q.    Is there a written contract

9    between Lanier Orthopedics and Smith &

10   Nephew?

11       A.    Yes.

12       Q.    And was there one back in June

13   of '03?

14       A.    Yes.

15       Q.    Is it the same one?

16       A.    Yes.

17       Q.    Do you recollect discussions

18   with Dr. Hodurski in December or January of

19   -- December '03, January of '04, with

20   respect to a constraining liner and ring of

21   the reflection variety with reference to

22   Mary Bloodsworth?

23       A.    Are we talking about after the

# FREEDOM COURT REPORTING

Page 32

1    primary surgery?

2         Q.    Yes, sir, we're talking --

3         A.    After the --

4         Q.    -- about after the -- during

5    the course following that surgery, there

6    were several dislocations, and there came a

7    time in December of '03 or January of '04

8    where the doctor wanted to try a

9    constraining liner and ring.

10        A.    Uh-huh (Nodding head).

11        Q.    That's the time I'm talking

12   about.  Did you and he have discussions

13   about that?

14        A.    Yes, we did.

15        Q.    Would that have been -- best

16   judgment, was that in late December or

17   early January, or do you remember?

18        A.    I don't remember.

19        Q.    Does that time frame sound

20   about right, or do you remember?

21        A.    All I remember as far as time

22   line would be that he and I discussed this

23   when he determined that he wanted to do the

# FREEDOM COURT REPORTING

1    revision, whatever time that was.

2         Q.    Okay.  And so if the hospital

3    records indicate that it was originally

4    scheduled for early January of '04, then

5    your best judgment would be the

6    conversation would have been around that

7    time?

8         A.    Yes.

9         Q.    Tell me what you remember to

10   have been the substance of the

11   conversation, specifically what Dr. Donald

12   Hodurski said to you and what you said to

13   Dr. Hodurski?

14        A.    Well, about all I remember was

15   that due to the frequency or the number of

16   dislocations that she had had, he would

17   like to consider doing a revision total hip

18   on Ms. Bloodsworth.

19        Q.    Okay.  And what did you say to

20   him?

21        A.    Nothing to say.  Okay.

22        Q.    Do you remember there being a

23   delay in your ability to obtain a size 52

1  Reflection constraining liner and ring?

2          A.    There was a delay.

3          Q.    And the reason for that delay?

4          A.    The reason for the delay was

5  that that particular size was not available

6  on -- it was in the process of being

7  produced, but the availability at that time

8  was not there.

9          Q.    Had the company run out of

10  them, or had they not --

11          A.    No.

12          Q.    -- come to market with a size

13  52?  And by as far as come to market, they

14  didn't have any available for distribution

15  at that time in January?

16          A.    The inventory on the

17  constraining liners was a limited inventory

18  on initial release, which means for the

19  extremely smaller sizes or the larger

20  sizes, they had not come to market yet.

21          Q.    Okay.  Did the size 52 -- does

22  that ring true that we're dealing with a

23  size 52?

## FREEDOM COURT REPORTING

1      A.    I don't remember the exact

2   sizes.

3      Q.    Okay, the -- well, okay.  The

4   size 52, is that, on either end, is that

5   relatively large or relatively small in the

6   context of your last answer?

7      A.    Size 52 is on the small side,

8   but it's not an odd size, but it -- it's

9   just -- if, in fact, that was the size she

10  has in, I don't remember, whatever size she

11  had in was on the small side because we did

12  not have that size available.

13     Q.    Well, you would have -- then

14  you communicated that to Hodurski, would

15  you have not?

16     A.    I communicated that to him when

17  I had to go back and determine what size

18  she had in place.  I did not have that to

19  memory at the time we scheduled the case.

20     Q.    Sure.  Okay.  And when you

21  checked you found that it had not come to

22  market yet, but was it in the process of

23  coming to market?

## FREEDOM COURT REPORTING

1      A.    It was.

2      Q.    And you got an ETA?

3      A.    I did.

4      Q.    And that ETA was about a month

5  away from the originally scheduled

6  constraining liner and ring surgery?

7            MR. POPE:   Object to the form

8  of the question.

9      A.    Somewhere around there.  I

10  don't remember the exact period of time.

11  Three to four weeks, something along that

12  line.  We did have an ETA, though.

13      Q.    (BY MR. DUTTON)  Okay.  Do you

14  remember Dr. Hodurski telling you he would

15  not have installed the, whatever size it

16  was, system had he known at the time, that

17  is, June '03, that a constraining liner and

18  ring to supplement it, if necessary, was

19  unavailable?

20      A.    No.

21      Q.    Are you saying he did not tell

22  you that?

23      A.    He did not make that statement.

# FREEDOM COURT REPORTING

1    (Whereupon, an off-the-record

2    discussion was had).

3    (Recess from 9:39 A.M. until

4    9:44 A.M.)

5    Q.    (BY MR. DUTTON)  I can't read

6    my own writing, so I'm going to have to ask

7    you this again, sir, or I want to make sure

8    that I can.  Did you say if I were to ask

9    -- want to get the xerox-copied material

10    that you would have given Dr. Hodurski back

11    at the time of the original surgery, I

12    would ask Smith & Nephew for the interim

13    technique that was released at about the

14    time the Reflection constraining liner and

15    ring was first released?

16    A.    Yes.

17    Q.    You're aware that physicians,

18    surgeons, in your line of effort, they rely

19    on information you give them?

20    MR. POPE:  Object to the form

21    of the question.

22    A.    In regards to?

23    Q.    (BY MR. DUTTON)  Say, with

## FREEDOM COURT REPORTING

1    respect to the interim technique that you

2    said you gave Dr. Hodurski.

3         A.   They use the documentation that

4    we provide for them to give them

5    information about the products.

6         Q.   That's what you're there for,

7    isn't it, I mean, true?

8         A.   To give them information,

9    that's right.

10        Q.   And you would expect them to

11   rely on it, would you not?

12             MR. POPE:   Object to the form

13   of the question.

14        Q.   (BY MR. DUTTON)   You may

15   answer.

16        A.   I would expect them to use the

17   information that I give them.

18        Q.   You don't expect them to rely

19   on that information, or are we saying the

20   same thing?

21             MR. POPE:   Object to the form

22   of the question.   I think he said what he

23   expects them to do with it, but go ahead

## FREEDOM COURT REPORTING

1    and tell him again.

2         A.    When you say I expect them to

3    do that --

4         Q.    (BY MR. DUTTON)  Yeah.

5         A.    -- I provide information for

6    them to use, and whether or not they use

7    it, that's their call.  If they want to use

8    my system, I make sure that they have the

9    information in hand that describes the

10   system so that they're not in the dark

11   about how the system works.

12        Q.    And you --

13        A.    Now, if they don't read it,

14   that's their call.

15        Q.    It would not surprise you if

16   they were to rely on it?

17             MR. BARTON:  Object to the

18   form.

19             MR. POPE:  Object to the form

20   of the question.

21        Q.    (BY MR. DUTTON)  True?

22        A.    It would not surprise me if

23   they relied on the information.

# FREEDOM COURT REPORTING

1      Q.    Day in and day out you see

2   them doing so, don't you?

3               MR. POPE:   Object to the form

4   of the question.

5      A.    Day in and day out?

6      Q.    (BY MR. DUTTON)   Yes, sir.

7      A.    Not necessarily.

8      Q.    Routinely you see them doing

9   so, don't you?

10              MR. POPE:   Object to the form

11  of the question.

12     A.    No.

13     Q.    (BY MR. DUTTON)   They ignore --

14  routinely they ignore the information you

15  give them?  Is that what you're saying?

16     A.    No, they don't ignore it.

17     Q.    They use it, don't they?

18     A.    How do you mean they use it?   I

19  mean, what are you -- in a procedure?

20     Q.    Yeah.

21     A.    Are you saying in a surgical

22  procedure, they're using the information --

23     Q.    Or prior thereto -- I didn't

## FREEDOM COURT REPORTING

1    mean to interrupt.  I wasn't trying to be

2    rude.

3         A.   No, I'm saying in a surgical

4    procedure, as they're inserting these

5    implants, they're using the technique that

6    is provided for them from the company.

7              MR. POPE:  Tell him what you

8    mean -- who's the company?

9         A.   I'm sorry, Smith & Nephew.

10        Q.   (BY MR. DUTTON)  Do you know of

11   any information you communicated to Dr.

12   Hodurski about the -- either the Echelon

13   femoral, the Reflection acetabular, or the

14   Reflection constraining liner and ring

15   systems upon which he did not rely?

16             MR. POPE:  Object to the form

17   of the question.

18        A.   All right, let's take it one

19   step at a time.

20        Q.   (BY MR. DUTTON)  Sure.

21        A.   Do I remember providing the

22   information for the Echelon -- say that --

23        Q.   Okay, I'll repeat --

# FREEDOM COURT REPORTING

1      A.    You had three questions in one,

2  actually, so --

3      Q.    Okay.   Your lawyer is supposed

4  to make that objection.

5           MR. POPE:   I did.

6      Q.    (BY MR. DUTTON)   Do you

7  remember providing Dr. Hodurski any

8  information about the Reflection

9  constraining liner and ring upon which he

10  did not rely?

11           MR. POPE:   Object to the form

12  of the question.

13      A.    No, I don't remember.

14      Q.    (BY MR. DUTTON)   Okay.   If I

15  asked you the same question with the

16  Reflection acetabular system, would your

17  answer be the same?

18           MR. POPE:   Same objection.

19      A.    I don't remember when I

20  provided information to him about

21  Reflection.

22      Q.    (BY MR. DUTTON)   Okay, so do

23  you remember providing him any information

## FREEDOM COURT REPORTING

1  about the Reflection acetabular system upon

2  which he did not rely?

3            MR. POPE:  Object to the form

4  of the question.

5      A.    I don't remember providing him

6  with information on the Reflection, period,

7  whether he did or did not rely on it.

8      Q.    (BY MR. DUTTON)  Well, that's

9  -- I could ask you the same question the

10  other way.  I choose to ask it in a

11  particular way, and that's why I'm wanting

12  an answer to my question.  I'm not fussing

13  at you.

14            Do you remember providing him

15  any information about the acetabular

16  Reflection system upon which he did not

17  rely?

18            MR. POPE:  Object to the form

19  of the question.

20      A.    No.

21      Q.    (BY MR. DUTTON)  If I asked you

22  the same question about the Echelon system,

23  would your answer be the same?

## FREEDOM COURT REPORTING

1          MR. POPE:  Same objection.  Go

2    ahead if you understand what he's asking.

3    I'm just giving my  --

4          A.   I don't remember.

5          Q.   (BY MR. DUTTON)  Okay.

6          A.   I don't.

7          Q.   Did your company offer any

8    other acetabular components other than the

9    Reflection system back at the time we're

10    talking about?

11          MR. POPE:  Lanier or Smith &

12    Nephew?

13          MR. DUTTON:  Excuse me, Smith &

14    Nephew.

15          MR. POPE:  Well, I didn't know

16    if you --

17          MR. DUTTON:  Thank you.

18          MR. POPE:  He might be

19    distributing other stuff.

20          MR. DUTTON:  Thank you.

21          A.   That's -- no.  The Reflection

22    system was the only acetabular system that

23    Smith & Nephew had at that time.

## FREEDOM COURT REPORTING

1      Q.    (BY MR. DUTTON)   Its

2  predecessor system was named what, if you

3  remember?

4      A.    The system prior to Reflection

5  was called Optifix.

6      Q.    Was there a constraining liner

7  and ring system that accompanied the

8  Optifix system?

9      A.    No.

10      Q.    What prompted the company to

11  make available the constraining liner and

12  ring, that you know of, the company being

13  Smith & Nephew?

14      A.    The only -- I could not offer

15  -- answer that because that would just be

16  conjecture.  I don't know.  You would have

17  to ask the engineers.

18      Q.    I'm not asking you to guess,

19  I'm asking you if you heard anything?

20      A.    I have not heard anything.

21      Q.    Have you heard anything in the

22  nature of the Smith & Nephew systems are

23  dislocating too much and we're coming up

## FREEDOM COURT REPORTING

1    with this to try to fix the problem?

2         A.    No.

3              MR. DUTTON:  Anything else,

4    boys?

5              MR. POPE:  (Shaking head).

6              MR. DUTTON:  Sir, thank you for

7    your time.

8              (Whereupon, an off-the-record

9    discussion was had).

10             MR. DUTTON:  I do -- wait a

11   minute.  One thing before I get -- I'm not

12   through.

13

14             (Whereupon, Plaintiff's Exhibit

15   Number 1 was marked for identification and

16   copy of same is attached hereto).

17

18        Q.   (BY MR. DUTTON)  Exhibit 1,

19   sir, is a response to the notice of

20   deposition.  I don't even know if you've

21   seen it or not, and it's not -- that's

22   really not my point.

23             MR. POPE:  That's what we're

## FREEDOM COURT REPORTING

1  talking about {Indicating}.

2  MR. DUTTON: Yeah, could you

3  let him look at that one with yours, and

4  I'll look at -- yeah, thanks.

5  Q. (BY MR. DUTTON) Do you report

6  to Smith & Nephew with respect to your

7  contacts with physicians?

8  A. No.

9  Q. So you -- you're familiar with

10 what's referred to in the industry as call

11 notes?

12 A. I am.

13 Q. You don't make them to Smith &

14 Nephew?

15 A. No.

16 Q. And did not make them during

17 the times we've been talking about --

18 A. No.

19 Q. -- this morning with respect to

20 conversations you've had with Dr. Hodurski?

21 A. I did not.

22 Q. Okay. And you've told me about

23 the sales training material you received

## FREEDOM COURT REPORTING

1   about the products we've talked about this

2   morning and the sales materials -- or sales

3   information you communicated to Dr.

4   Hodurski?

5           A.    (Nodding head).

6           MR. POPE:  You need to

7   verbalize your answer.

8           A.    Yes.  Yes, I'm sorry.

9           Q.    (BY MR. DUTTON)  You have no

10  sales materials in your possession?

11          A.    No.

12          Q.    You have no call notes in your

13  possession?

14          A.    No, sir.

15          Q.    You have no sales training

16  materials --

17          A.    No, sir.

18          Q.    -- in your possession?

19          A.    I do not.

20          MR. POPE:  With respect to

21  these products?

22          MR. DUTTON:  The ones we've

23  been talking about.

# FREEDOM COURT REPORTING

1    Q.    (BY MR. DUTTON)   Why don't you

2    have them with respect to these products?

3    I'm not talking about -- you don't keep

4    sales training materials?

5    A.    I do on some products.

6    Q.    Okay, but not on these?

7    A.    Not on this.

8    Q.    Okay.  And you have no

9    documents to indicate anything about or

10   reports of any problems with the Reflection

11   systems?

12   A.    No.

13   Q.    Okay.

14        MR. DUTTON:   I offer 1.   That's

15   all.  I'll say it again, thank you, sir.

16

17        FURTHER THE DEPONENT SAITH NOT

18

19

20

21

22

23

# FREEDOM COURT REPORTING

1               C E R T I F I C A T E

2

3    STATE OF ALABAMA:

4    JEFFERSON COUNTY:

5

6        I hereby certify that the above and

7    foregoing deposition was taken down by me

8    in stenotype, and the questions and answers

9    thereto were reduced to typewriting under

10   my supervision, and that the foregoing

11   represents a true and correct transcript of

12   the deposition given by said witness upon

13   said hearing.

14       I further certify that I am neither of

15   counsel nor kin to the parties to the

16   action, nor am I in any way interested in

17   the result of said cause.

18

19

20   KERRY K. THAMES - COMMISSIONER

21

22

23

# FREEDOM COURT REPORTING

Page 51

## A

ability 33:23
accompanied 45:7
acetabular 8:21,22 9:17 9:19 11:12 22:16,17 41:13 42:16 43:1,15 44:8 44:22
acting 5:1
action 1:5 50:16
adding 15:22
address 5:22 6:9,10,12
advised 23:4
ago 10:7 27:21
AGREED 1:19 2:4,11,20
agreement 31:4
ahead 16:3 29:1 38:23 44:2
al 1:11
Alabama 1:2 2:1 4:8,16 6:2,4 50:3
allow 25:3
AmSouth-H... 2:1 4:15
answer 6:20 12:19 13:14 13:19 18:9,10 18:16,22 23:19 29:1 35:6 38:15 42:17 43:12 43:23 45:15 48:7
answers 50:8
apologize

11:15
APPEARAN... 4:1
asked 11:15 12:13 18:15 42:15 43:21
asking 10:15 13:6 44:2 45:18,19
assembly 23:10,12
assign 2:16
assume 14:3
attached 46:16
availability 21:7,23 22:9 27:10 28:2 34:7
available 12:6 13:7,21 14:1 17:21,22 18:12 19:2,4 19:7,12 20:1 20:3,3,21 21:1,3 26:15 34:5,14 35:12 45:11
aware 37:17
A.M 2:3 37:3,4

## B

back 14:4 18:18 21:19 22:6 31:12 35:17 37:10 44:9
Barton 4:12,14 39:17
basically 25:4 25:5
becoming 17:20
believe 11:2 26.2

best 32:15 33:5
bill 17:14,15
Birmingham 2:1 4:8,16
Bloodsworth 1:7,8 31:22 33:18
book 17:3
bottom 25:11
boys 46:4
brochure 26:4
business 6:9

## C

C 4:12 50:1,1
call 7:21 8:13 8:20 9:18 13:22 25:22 29:4 39:7,14 47:10 48:12
called 9:20 45:5
calling 14:7
Carriage 6:1
carry 19:23
case 35:19
cause 5:6 50:17
certainly 10:19
certify 5:2 50:6 50:14
chance 15:8
changes 29:22
check 17:2
checked 35:21
choose 43:10
chooses 14:19
Civil 1:5 5:3
close 7:5 11:23
come 7:8 10:2 28:8 34:12,13 34:20 35:21
comes 24:1,7
coming 23:4

35:23 45:23
commencing 2:2
commissioner 1:23 2:22 5:2 50.20
communicate 21:22
communicated 21:5 22.7 35:14,16 41:11 48:3
company 23:6 28:16,21 29:22 30:2,6 30:8 31:5 34:9 41:6,8 44:7 45:10,12
company's 24:22
complete 16:1
compliance 2:8
component 8:21,21 9:9 9:11,19
components 9:15,17 44:8
conjecture 45:16
consider 33:17
constraining 7:23,23 8:7 8:10 11:7,16 14:7,22 15:3 15:13,22 16:8 17:20 20:20 21:1,8,14,17 22:1,10,12,14 22:20 27:3,11 29:9 31.20 32:9 34:1,17 36:6,17 37:14 41:14 42:9 45:6,11

contacts 47:7
context 35:6
Continuously 6:6
contract 29:17 31:8
contractor 29:20 30:7,12 30:21 31:4
conversation 33:6,11
conversations 47:20
copy 25:23 28:5,17 46:16
corporation 29:18 30:10
correct 8:12 9:23 15:19 20:10 21:21 22:11 30:17 50:11
corresponde... 23:6 24:1
counsel 1:21 2:13,15 5:5 50:15
COUNTY 50:4
course 17:9 32:5
court 1:1 2:9 5:14
cup 8:22 13:7
cups 10:6
customers 26:12

## D

dark 39:10
date 5:2 11:21 12:20
dates 8:5
day 13:3 40:1,1 40:5,5

# FREEDOM COURT REPORTING

deal 6:21
dealing 34:22
dealt 7:1
**December**
  31:18,19 32:7
  32:16
decided 26:21
decision 20:6
decrease 15:7
  15:16
**DEFENDAN...**
  1:12 4:11
delay 33:23
  34:2,3,4
**DEPONENT**
  49:17
deposition
  1:14,21 2:6,7
  2:18,21 46:20
  50:7,12
depositions
  2:10
describe 25:18
described
  27:18,21
describes 39:9
describing
  23:6
determine 17:4
  35:17
determined
  32:23
devices 7:17
different 7:17
  9:12,13
differently
  18:17
direct 30:4,8
directly 30:12
disclose 25:2
disclosed 24:2
discuss 21:13
  21:16
discussed

32:22
discussion 37:2
  46:9
discussions
  31:17 32:12
dislocating
  45:23
dislocation
  15:8
dislocations
  15:17 32:6
  33:16
distributed
  27:7 28:11
distributing
  44:19
distribution
  26:8,9 34:14
distributor
  30:16
distributors...
  30:9
**DISTRICT** 1:1
  1:2
**DIVISION** 1:3
doctor 17:1
  26:23 32:8
doctors 6:21
  7:1
document
  25:19,19,22
  26:8 27:8,17
  27:20,23 28:4
  28:18,18
documentati...
  38:3
documents
  49:9
doing 33:17
  40:2,8
Donald 1:15
  1:22 5:5,10
  5:20 33:11
Dr 6:14 7:16

21:5,18 22:8
27:8,16 31:18
33:11,13
36:14 37:10
38:2 41:11
42:7 47:20
48:3
Drive 6:1
due 33:15
duly 5:11
Dutton 3:5 4:4
  4:5 5:18 6:23
  7:12,19,20
  9:6 11:1,3
  12:12,17 13:3
  13:9 16:7
  18:8,13 20:14
  20:17 24:5
  25:7 26:20
  28:23 29:5
  30:14 36:13
  37:5,23 38:14
  39:4,21 40:6
  40:13 41:10
  41:20 42:6,14
  42:22 43:8,21
  44:5,13,17,20
  45:1 46:3,6
  46:10,18 47:2
  47:5 48:9,22
  49:1,14

_____
        **E**
**E** 50:1,1
early 32:17
  33:4
Echelon 8:20
  9:7,10,10,22
  10:9,10 16:10
  16:15 41:12
  41:22 43:22
effect 2:8
effort 37:18
either 17:2

35:4 41:12
employee
  29:12
engineers
  45:17
ensure 17:7
et 1:11
ETA 36:2,4,12
evidence 2:18
exact 10:19
  25:4 35:1
  36:10
exactly 10:13
  11:21 12:5
  25:2
examination
  3:3 5:7,18
examined 5:11
Excuse 44:13
Exhibit 3:11
  46:14,18
**EXHIBITS** 3:9
expect 38:10
  38:16,18 39:2
expects 38:23
experience
  20:9
extensive
  15:21
extent 28:20
extremely
  34:19
eyes 24:17

_____
        **F**
**F** 50:1
fact 35:9
familiar 47:9
far 21:1 24:8
  32.21 34:13
Federal 5:3
feels 14:21
  15:2
femoral 8:20

9:3,4,9,15,22
10:9 41:13
fifteen 10:5,7
filing 2:21
filled 16:19
find 28:17
flue 5:16 14:18
first 5:11 25:20
  37:15
five 6:7 11:5
fix 46:1
following 5:7
  32:5
follows 5:12
force 2:7
foregoing 5:4
  50:7,10
form 2:14 6:19
  12:8,15 16:2
  18:5,6 23:15
  23:16,18
  27:16 28:19
  36:7 37:20
  38:12,21
  39:18,19 40:3
  40:10 41:16
  42:11 43:3,18
formal 23:2,23
found 35:21
four 36:11
frame 32:19
frequency
  33:15
full 2:8
further 2:4,11
  2:20 15:16
  49:17 50:14
fussing 43:12
future 26:5

_____
        **G**
generally 20:6
give 12:3,20
  26:11,23 27:4

# FREEDOM COURT REPORTING

37:19 38:4,8
38:17 40:15
given 27:16
37:10 50:12
giving 10:16
44:3
go 11:17 14:15
16:3 26:11
29:1 35:17
38:23 44:1
going 14:5
17:5 18:22
19:23 25:10
37:6
greater 11:5
grounds 2:16
group 6:18,22
7:2 27:9
guess 25:21
45:18

**H**
hand 39:9
hard 25:23
head 9:1,2,3
23:13 27:19
30:23 32:10
46:5 48:5
heads 9:4
heard 45:19,20
45:21
hearing 50:13
HELLUMS
4:5
hereto 46:16
hip 7:12 8:17
16:21 28:12
28:15 29:4
33:17
Hodurski 6:15
7:16 21:5,18
22:8 27:8,16
31:18 33:12
33:13 35:14

36:14 37:10
38:2 41:12
42:7 47:20
48:4
home 6:11
HOOKS 4:5
hospital 17:8
17:10,16 33:2

**I**
identification
46:15
ignore 40:13
40:14,16
implanted 7:13
7:17 8:14
16:16
implants 17:10
41:5
independent
29:19 30:6,7
30:12,21 31:3
INDEX 3:1
indicate 33:3
49:9
Indicating
47:1
indication
14:12,13,16
15:5
individually
20:13
industry 47:10
information
24:12 25:17
26:23 28:1
37:19 38:5,8
38:17,19 39:5
39:9,23 40:14
40:22 41:11
41:22 42:8,20
42:23 43:6,15
48:3
initial 8:4 10:6

11:20 18:23
34:18
initially 29:10
30:10
inserting 41:4
installed 36:15
instruments
17:9,12
interchangea...
9:5
interested
50:16
interim 24:10
25:15 29:8
37:12 38:1
interrupt 41:1
inventory
17:11 34:16
34:17
invoiced 17:16
involvement
16:19
in-office 24:2
issue 17:14
issued 24:11
items 17:18

**J**
James 1:15,22
4:12 5:5,10
5:20
January 1:16
2:2 31:18,19
32:7,17 33:4
34:15
JEFFERSON
50:4
JERRY 1:8
JOHNSTON
4:14
joint 15:17
Jr 4:12
judgment
10:16,17 11:5

15:15 32:16
33:5
July 10:21
June 10:22,23
11:1 12:1,14
12:22 16:17
21:20 22:6
27:9 31:1,12
36:17

**K**
K 1:23 5:1
50:20
keep 49:3
Kerry 1:23 5:1
50:20
kin 50:15
kind 24:18
KIRBY 4:5
knew 6:13 19:3
20:18,22 21:2
know 6:14
7:10 8:5 10:3
10:5 11:22
12:4,10,16
13:6,10,11,20
13:23 14:2
17:5 18:1,3
18:11,14 19:1
19:6,8,11,13
19:21 24:3
25:1,5,8,9,10
41:10 44:15
45:12,16
46:20
known 12:18
36:16

**L**
L 1:18
Lanier 1:15,22
5:6,10,20
29:18 30:22
31:6,9 44:11
large 35:5

larger 34:19
late 32:16
laws 2:9
lawyer 42:3
leading 2:14
Lee 4:13
letter 25:11
let's 7:20 41:18
life 6:5
likelihood
15:16
limited 34:17
line 32:22
36:12 37:18
liner 7:23 8:1,8
8:10 11:7,16
14:7,14,16,22
15:4,22 16:8
17:20 20:20
21:1,14 22:13
22:14,21 27:3
27:11 29:9
31:20 32:9
34:1 36:6,17
37:14 41:14
42:9 45:6,11
liners 15:13
21:8,17 22:1
22:10 34:17
lived 6:3
long 6:3 7:3
10:7,10 29:21
look 24:12
47:3,4
L-a-n-i-e-r
5:21

**M**
M 4:13
manner 22:2
marked 46:15
market 7:9 8:2
10:2,4 11:4
11:18 14:1

23:4 34:12,13
34:20 35:22
35:23
**marketing**
13:22 28:13
28:15 29:4
**Mary** 1:7
16:16 31:22
**Mary's** 21:19
22:7
**material** 23:15
24:7,16 25:3
37:9 47:23
**materials**
23:16 25:13
48:2,10,16
49:4
**mean** 9:3 12:10
14:10 26:1,9
38:7 40:18,19
41:1,8
**meaning** 14:13
**means** 25:8
34:18
**Medical** 30:19
**memory** 35:19
**MIDDLE** 1:2
**minute** 46:11
**minutes** 27:21
**Montgomery**
6:2,4
**month** 36:4
**months** 12:4
**morning** 47:19
48:2

**N**

**N** 1:18
**name** 5:19 16:9
28:18 30:21
**named** 45:2
**nature** 23:1
45:22
**nearly** 30:7

**necessarily**
40:7
**necessary** 2:12
36:18
**need** 14:22
48:6
**needed** 13:17
13:20 17:8
19:9,12 26:18
26:21
**needs** 15:1
**neither** 50:14
**Nephew** 1:11
9:4 17:17
23:3 28:9,11
28:22 29:4,13
29:20 30:3,11
30:13 31:10
37:12 41:9
44:12,14,23
45:13,22 47:6
47:14
**Nodding** 23:13
27:19 30:23
32:10 48:5
**North** 4:7
**NORTHERN**
1:3
**notes** 47:11
48:12
**notice** 2:21
46:19
**number** 17:17
33:15 46:15

**O**

**O** 1:18
**object** 6:19
12:8,15 16:2
18:5,6 23:18
28:19 36:7
37:20 38:12
38:21 39:17
39:19 40:3,10

41:16 42:11
43:3,18
**objection** 42:4
42:18 44:1
**objections** 2:13
2:16
**observation**
15:21
**obtain** 33:23
**obtained** 12:19
13:14
**obtaining**
13:19
**odd** 35:8
**offer** 44:7
45:14 49:14
**offered** 2:18
**office** 6:10
**off-the-record**
37:1 46:8
**oh** 10:4
**okay** 6:23 7:19
8:7,13,23
9:11 10:8,15
10:20 11:13
11:14,23 12:6
16:14,23
18:19,20,21
19:10,20
20:11,15
23:14 24:15
24:21 25:12
25:18 26:7
28:14,23 33:2
33:19,21
34:21 35:3,3
35:20 36:13
41:23 42:3,14
42:22 44:5
47:22 49:6,8
49:13
**once** 10:12
11:19 13:10
17:13

**ones** 48:22
**operating**
23:17 30:20
**operation**
15:21
**Optiflx** 45:5,8
**oral** 5:7
**order** 16:17,18
**ordered** 19:15
27:5
**organization**
24:15
**original** 8:15
8:16,17 10:21
12:7 13:1,4
15:23 17:22
20:19,23 21:6
21:12,19 22:7
27:15 37:11
**originally** 33:3
36:5
**orthopedics**
9:14 29:19
30:22 31:6,9
**owner** 31:6

**P**

**P** 1:18
**PAGE** 3:3
**Park** 4:6,7
**part** 8:9,11
9:10,12
**partial** 14:4
**particular** 17:9
18:12 34:5
43:11
**parties** 1:20
2:15 50:15
**period** 8:3
11:20 36:10
43:6
**person** 24:4
**personal** 26:6
**photocopies**

26:2
**photocopy**
26:3
**physicians**
23:17 37:17
47:7
**physician's**
15:15
**PITTMAN** 4:5
**place** 4:6,7
30:10 35:18
**placed** 16:18
**Plaintiff's** 3:11
46:14
**PLAINTIFF...**
1:9 4:3
**plan** 23:22
**Plaza** 2:1 4:15
**please** 5:19,23
**PO** 17:17
**point** 17:6
46:22
**Pope** 4:13 5:16
6:19 7:10,14
9:1 10:23
12:8,15 13:2
13:5 16:2
18:5,10 20:12
20:15 23:18
24:23 26:19
28:19 29:1
30:1 36:7
37:20 38:12
38:21 39:19
40:3,10 41:7
41:16 42:5,11
42:18 43:3,18
44:1,11,15,18
46:5,23 48:6
48:20
**possession**
48:10,13,18
**POWELL**
4:14

# FREEDOM COURT REPORTING

predecessor 45:2
prelaunch 22:23
premarket 22:19
present 15:1
Pretty 6:5
previous 14:21
previously 22:15
primary 8:19 9:6 11:20 15:8 16:1,21 19:15,17 32:1
prior 2:18 17:19 27:15 29:10 40:23 45:4
probably 10:10,11 21:2 24:9
problem 46:1
problems 49:10
procedure 5:4 10:21 16:1,23 17:13 40:19 40:22 41:4
proceedings 5:8
process 34:6 35:22
PROCTOR 4:14
produced 34:7
product 7:7,11 13:21,23 23:7 23:8 24:13 29:11
products 38:5 48:1,21 49:2 49:5
prompted

45:10
prosthesis 15:23
prosthetic 7:12 15:17
provide 15:7 17:8 38:4 39:5
provided 5:3 17:12 41:6 42:20
providing 41:21 42:7,23 43:5,14
proximity 11:23
purchase 17:18
purpose 15:6 15:10,11
put 24:13

**O**

question 6:20 10:8 12:9,14 12:19 13:14 13:19 14:1,5 16:3 18:6,7 18:15,17 21:9 23:19 28:20 29:2 36:8 37:21 38:13 38:22 39:20 40:4,11 41:17 42:12,15 43:4 43:9,12,19,22
questions 2:14 2:15 42:1 50:8

**R**

R 50:1
read 24:22 25:3 37:5 39:13

reading 2:5
really 8:1 10:3 12:10 23:21 23:23 46:22
reason 13:11 21:13 34:3,4
receive 25:12
received 22:19 47:23
Recess 37:3
recollect 31:17
records 33:3
recount 18:19
redo 16:1
reduced 50:9
refer 9:7
reference 16:15 31:21
referred 47:10
referring 7:22 28:21
reflection 8:22 9:18,20,21 10:1 16:10,12 16:15 17:19 20:20,23 21:7 21:18 22:1,9 22:12,16,20 27:10 29:9 31:21 34:1 37:14 41:13 41:14 42:8,16 42:21 43:1,6 43:16 44:9,21 45:4 49:10
regard 10:9
Regarding 7:7
regards 37:22
relating 2:9
relationship 29:15 30:15
relatively 35:5 35:5
release 29:11

34:18
released 26:4 29:10 37:13 37:15
relied 39:23
rely 37:18 38:11,18 39:16 41:15 42:10 43:2,7 43:17
remember 8:5 10:13 11:21 13:12 26:19 32:17,18,20 32:21 33:9,14 33:22 35:1,10 36:10,14 41:21 42:7,13 42:19,23 43:5 43:14 44:4 45:3
rep 30:6
repeat 15:15 41:23
replace 22:13
replacement 8:17
report 47:5
REPORTER 5:14
reports 49:10
represents 50:11
requested 27:2
requests 26:23
required 19:23
requires 15:3
residence 5:22
respect 18:16 21:6,23 27:9 28:1 31:20 38:1 47:6,19 48:20 49:2
respective 1:21

response 46:19
result 50:17
resulting 14:20
revise 15:2
revision 33:1 33:17
right 10:21 12:20 13:2,16 16:22 18:18 21:11 24:5 32:20 38:9 41:18
ring 8:8,11 11:8,17 14:8 15:23 16:8 17:20 20:20 22:13,14,21 27:3,11 31:20 32:9 34:1,22 36:6,18 37:15 41:14 42:9 45:7,12
rings 15:13 21:8,17 22:1 22:10
routinely 40:8 40:14
Royal 6:1
rude 41:2
rules 2:9 5:3
run 34:9

**S**

S 1:18
SAITH 49:17
sales 23:15,22 23:23 24:7,16 47:23 48:2,2 48:10,15 49:4
save 15:14
saying 10:13 17:21 20:18 25:6 36:21 38:19 40:15

40:21 41:3
says 25:1,2,9
schedule 17:1
  17:3,3 26:8
  26:10
scheduled 17:5
  33:4 35:19
  36:5
see 40:1,8
seen 25:7
  46:21
sent 23:5
Shaking 46:5
share 25:13
shared 23:16
  24:17
sic 18:20
side 11:12 35:7
  35:11
signature 2:5
simply 13:22
  17:7 24:1
  29:3
sir 5:19 8:18
  16:22 18:13
  19:18 21:10
  32:2 37:7
  40:6 46:6,19
  48:14,17
  49:15
situation 14:20
  15:3
six 12:4
size 18:16 19:6
  19:8,13,16,22
  19:23 20:2,12
  21:23 22:9
  27:10 28:1
  33:23 34:5,12
  34:21,23 35:4
  35:7,8,9,10
  35:12,17
  36:15
sizes 20:19

21:3 23:9,11
  34:19,20 35:2
small 35:5,7,11
smaller 34:19
Smith 1:11 9:4
  17:17 23:3
  28:8,10,21
  29:4,12,20
  30:3,11,12
  31:9 37:12
  41:9 44:11,13
  44:23 45:13
  45:22 47:6,13
sole 31:5
soon 26:14
sorry 41:9 48:8
sort 25:16
sound 10:21
  32:19
Spar 30:18,19
speak 24:18
specifically
  33:11
specifics 8:6
stability 15:7
stable 15:18
stamp 24:19
stamped 24:18
standard 16:23
start 14:5
STATE 50:3
stated 16:6
  18:1
statement
  17:14,15
  18:20 36:23
STATES 1:1
stay 17:10
stenotype 50:8
step 41:19
STIPULAT...
  1:19 2:4,11
  2:20
stipulation 5:4

stipulations
  5:15
stuff 25:13
  44:19
substance
  33:10
supervision
  50:10
supplement
  11:9,11 36:18
supplements
  11:8
supposed 42:3
sure 8:1 12:11
  12:13 17:11
  18:21 20:16
  26:3 35:20
  37:7 39:8
  41:20
surgeon 14:19
  20:3,8 24:3
  25:14
surgeons 24:11
  25:3 37:18
surgeries 7:16
surgery 8:4,15
  8:16 11:20
  12:7 13:1,4
  14:21 17:2,3
  17:4,12,23
  18:23 19:1,22
  20:1,4,8,19
  20:23 21:6,12
  21:19 22:7
  23:8 24:14
  27:15 32:1,5
  36:6 37:11
surgical 40:21
  41:3
surprise 39:15
  39:22
sworn 5:11
system 9:10,12
  9:13,16,18

10:2,6,9
  11:17 16:9,12
  17:6 19:2,3
  19:17 21:18
  22:14,16,17
  36:16 39:8,10
  39:11 42:16
  43:1,16,22
  44:9,22,22
  45:2,4,7,8
systems 9:5
  11:3,9 16:16
  41:15 45:22
  49:11

**T**

T 1:18,18 50:1
  50:1
take 12:4
  41:18
taken 1:22
  50:7
talked 48:1
talking 12:1
  16:9 23:20
  31:23 32:2,11
  44:10 47:1,17
  48:23 49:3
technique 23:9
  23:11 24:10
  24:10 25:15
  25:19 27:16
  29:8 37:13
  38:1 41:5
tell 7:21 10:3
  12:11 30:1
  33:9 36:21
  39:1 41:7
telling 22:3
  36:14
ten 10:4,6,11
  10:11,13
testified 5:12
testimony

21:15 22:5
Thames 1:23
  5:1 50:20
thank 6:14
  44:17,20 46:6
  49:15
thanks 16:14
  47:4
thereto 2:19
  40:23 50:9
thing 8:9 38:20
  46:11
things 23:10
think 10:11
  19:1 26:3
  27:14 28:3
  30:3,4 38:22
three 36:11
  42:1
time 2:17,17
  8:4,14 10:7
  10:20 12:1,7
  13:7 14:2
  15:1 17:6,22
  18:2,12,23
  19:9 20:4,8
  20:18,22 21:2
  21:5,12,19
  22:3,6 24:9
  29:11 32:7,11
  32:19,21 33:1
  33:7 34:7,15
  35:19 36:10
  36:16 37:11
  37:14 41:19
  44:9,23 46:7
times 25:8
  47:17
told 12:13
  47:22
Tom 4:4
total 8:17
  28:15 29:4
  33:17

Tower 4:6
training 22:20
  22:23 23:2,15
  23:23 24:8,16
  47:23 48:15
  49:4
transcript
  50:11
trial 2:17
true 12:14,19
  27:11,12
  29:21 34:22
  38:7 39:21
  50:11
try 32:8 46:1
trying 6:13
  7:14 41:1
turn 17:16
twenty 7:5
  30:7
two 7:16
typewriting
  50:9

**U**

U 1:18
Uh-huh 23:13
  27:19 30:23
  32:10
unavailable
  36:19
understand
  23:20 44:2
understanding
  29:16
unit 8:11 9:7,8
  15:8 19:15
UNITED 1:1
universally
  20:7
unstable 15:1
untrue 27:13
  27:14
use 14:11 17:6

20:13 23:7
24:2 25:17
26:6,20,21
38:3,16 39:6
39:6,7 40:17
40:18
Usual 5:14
utility 14:6,9
  14:10

**V**

variety 31:21
verbalize 48:7
VS 1:10

**W**

wait 46:10
waived 2:6,22
want 37:7,9
  39:7
wanted 20:15
  28:16 32:8,23
wanting 43:11
wasn't 18:3
  41:1
way 43:10,11
  50:16
weeks 36:11
went 30:4,8,11
we're 7:8 16:8
  32:2 34:22
  44:9 45:23
  46:23
we've 47:17
  48:1,22
wiseacre 7:15
witness 2:6 5:6
  50:12
wording 25:4
words 27:4
work 6:17
  19:20 29:17
works 39:11
writing 37:6
written 31:4,8

**X**

xeroxed 27:20
xerox-copied
  37:9

**Y**

yeah 7:4,4
  10:18 11:1
  13:5,9 14:15
  14:18 18:6
  20:14 25:10
  25:21 26:22
  27:2,7 39:4
  40:20 47:2,4
years 6:7 7:6
  10:5,7,12,14
  11:5 30:8

**0**

03 10:21,22
  11:2 12:2,22
  16:17 21:20
  22:6 27:9
  31:1,13,19
  32:7 36:17
04 31:19 32:7
  33:4

**1**

1 3:12 46:15,18
  49:14
1st 12:14,22
1100 4:6
13 1:16 2:2

**2**

2 27:9
2nd 11:1 16:17
  31:1
2:05cv622-d
  1:5
2001 4:7 30:4,5
  30:11
2003 12:14
2006 1:16 2:2

2900 1:23 4:15

**3**

35203 4:8,16
3542 6:1

**4**

46 3:12

**5**

5 3:5
52 18:16 33:23
  34:13,21,23
  35:4,7

**9**

9:05 2:2
9:39 37:3
9:44 37:4

PLAINTIFF'S
EXHIBIT

1 - LANIER

RECD JAN 1 1 2006

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

MARY BLOODSWORTH and          )
JERRY BLOODSWORTH,            )
                             )
            Plaintiffs,       )
                             )        CASE NUMBER:
v.                           )
                             )          2:05cv622-d
SMITH & NEPHEW, INC.,        )
et al.,                      )
                             )
            Defendants.       )

### OBJECTION TO NOTICE OF TAKING DEPOSITION

Defendant Donnie Lanier ("Lanier"), pursuant to Rules 30(b)(5) and 34(b) of the Federal

Rules of Civil Procedure, objects as follows to request for documents contained in plaintiffs' Notice

of Taking Deposition of the Defendant, Donnie Lanier:

### GENERAL OBJECTIONS

1.      Lanier objects to producing any documents at his deposition scheduled for January

13, 2006.  The Court's Order of December 19, 2005 ("Order") permits plaintiffs to depose Lanier

on the limited topic of his communications with Mary Bloodsworth's physician, Donald F. Hodurski,

M.D. ("Dr. Hodurski"); the Order does not permit plaintiffs to request documents from Lanier, nor

does it require Lanier to produce documents to plaintiffs.

2.      Lanier objects to the request for documents on the grounds that requiring Lanier to

produce documents to plaintiffs prior to their responding to defendants' outstanding discovery and

prior to their providing their Rule 26 Initial Disclosures will unfairly prejudice Lanier.

3.      Lanier objects to the request for documents on the grounds that requiring Lanier to produce documents to plaintiffs prior to their amending their pleadings to comply with Rule 9(b) will unfairly prejudice Lanier.

4.      Lanier objects to the request for documents on the grounds that it requests that Lanier respond in a time period shorter than that prescribed by Rule 34.

## SPECIFIC OBJECTIONS

1.      Lanier objects to this request on the grounds that it exceeds the scope of the Court's Order allowing plaintiffs to depose Lanier about "the nature and extent of Lanier's statements to and communications with Mrs. Bloodsworth's surgeon concerning the products at issue." (Order, p. 22.) Specifically, communications between Lanier and Dr. Hodurski, other than those concerning Mrs. Bloodsworth and the subject products are beyond the scope of the Order.  In addition, any communications between Lanier and Kirklin Clinic are beyond the scope of the Order because the subject products were neither prescribed nor implanted at Kirklin Clinic.

Without waiver of those objections, Lanier states that he has no such documents in his possession relating to Mary Bloodsworth or the products that are the subject of this action.

2.      Lanier objects to this request on the grounds that it is beyond the scope of the Court's Order permitting plaintiffs to depose Lanier about "the nature and extent of Lanier's statements to and communications with Mrs. Bloodsworth's surgeon concerning the products at issue." (Order, p. 22.) Any "sales training materials" regarding the subject products, to the extent they exist, are in no way relevant to those statements and communications.

Without waiver of that objection, Lanier states that he has no documents in his possession that are responsive to this request.

2

3.      Lanier objects to this request on the grounds that it is beyond the scope of the Court's Order permitting plaintiffs to depose Lanier about "the nature and extent of Lanier's statements to and communications with Mrs. Bloodsworth's surgeon concerning the products at issue." (Order, p. 22.) Any "sales materials" regarding the subject products, to the extent they exist, are in no way relevant to those statements and communications.

4.      Lanier objects to this request on the grounds that it is beyond the scope of the Court's Order permitting plaintiffs to depose Lanier about "the nature and extent of Lanier's statements to and communications with Mrs. Bloodsworth's surgeon concerning the products at issue." (Order, p. 22.) Any "reports of problems" with the subject products, to the extent they exist, are in no way relevant to those statements and communications.

Lanier objects to this request to the extent that it requests information protected by federal or state rules, regulations or laws.

Without waiver of those objections, Lanier states that he has no documents in his possession that are responsive to this request.

James C. Barton, Jr.
Lee M. Pope
Alan D. Mathis

Attorneys for Defendant
Donnie Lanier

3

**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone: (205)458-9400
Facsimile:  (205)458-9500

## OF COUNSEL

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the above and foregoing upon all parties to this cause by hand delivery this the _____//_____ day of January 2006, to the following:

Mr. Tom Dutton
Pittman, Hooks, Dutton, Kirby
  & Hellums, P.C.
1100 Park Place Tower
2001 Park Place North
Birmingham, AL 35203

Of Counsel